476 S.E.2d 535

**STATE of West Virginia, Plaintiff Below, Appellee,**

v.

**Angela Dawn MILLER, Defendant Below, Appellant.**

No. 23155.

Supreme Court of Appeals of West Virginia.

Submitted April 30, 1996.

Decided June 14, 1996.

Dawn E. Warfield, Deputy Attorney General, Charleston, for Appellee.

James B. Billings, Oak Hill, for Appellant.

CLECKLEY, Justice:

The defendant below and appellant herein, Angela Dawn Miller, appeals a December 14, 1994, order of the Circuit Court of Wyoming County that denied her motion for a new trial. The defendant was convicted by a jury of first degree murder and was sentenced to life without a recommendation of mercy by order entered on October 27, 1994. The defendant raises a number of alleged errors on appeal, including: (1) the indictment misinformed the jury as to the elements of first degree murder; (2) the jury was not properly qualified to hear the evidence; (3) the jury was improperly instructed; (4) the prosecuting attorney made improper and prejudicial statements; (5) the grand jury was intentionally mislead by the State; and (6) ineffective assistance of counsel below constitutes plain error.[1] For the following reasons, we affirm the defendant's conviction.

I.

### FACTUAL AND PROCEDURAL BACKGROUND

We supply a thumbnail sketch of the relevant facts. During the early hours of October 9, 1993, the defendant shot and killed Jerry White outside a bar known as Tucky's located in Wyoming County. The defendant does not deny shooting the victim; however,

---

1. The defendant is represented by different counsel on appeal.

she states she cannot remember the shooting because at the time of the incident she was intoxicated and had taken several Valiums. At trial, the defendant claimed the facts did not warrant a conviction of first degree murder because the State failed to demonstrate the requisite mental state of premeditation. In the alternative, the defendant offered evidence that she acted in defense of herself and/or others when she shot the victim. There were numerous witnesses who testified at trial as to the events that transpired. The accounts given by these witness and by the defendant, who also testified at trial, often conflicted with one another. The following is a summary of the relevant facts.

During the afternoon of October 8, 1993, the defendant joined several others at her parent's house to assemble a water bed. One of the individuals helping assemble the bed was Tina Reed, the defendant's roommate and alleged homosexual partner. Also helping with the assembly of the bed was the defendant's father, Billy Miller, and a friend, Danny Little. While working on the bed, the group began drinking beer.

Later that evening, the group went to the house of the defendant's sister and brother-in-law, Tina and Timothy Church. Before leaving her parent's house, however, the defendant took a .38 revolver and stuck it in her pants. Mr. Miller also had a 9 millimeter weapon with him at the Church's house. Mrs. Church claimed the defendant was drunk when she arrived at the Church's house. The group continued to consume beer at that residence, and both the defendant and Ms. Reed testified the two of them took a few Valiums throughout the course of the evening.[2]

While at the Church house, Mr. Miller mentioned a couple of times that he would like to go to Tucky's bar. Believing the group was too drunk to drive, Mr. Church drove the defendant, Ms. Reed, Mr. Miller, and Mr. Little to Tucky's at approximately 1:00 a.m. on October 9, 1993. Mr. Church stated that once they arrived at the bar the defendant said she did not want to go into the bar because "there was too many people that didn't like her that hung around Tucky's and that's the reason she didn't want to go." According to Mr. Church, Mr. Miller assured the defendant nothing would happen if she stayed with him. The group then proceeded into the bar and sat down.

Once inside the bar, Ms. Reed apparently noticed the victim whom she had dated for almost three months approximately two and one-half to three years ago. The events described by the various witnesses from this point forward often conflict, and many of the witnesses admit they were drinking. The owner of the bar, Juanita "Tucky" Hughes, testified she saw Ms. Reed and the defendant approach the victim and Ms. Reed tell the victim that the defendant and she were married and he should leave her "'the hell alone.'" According to Ms. Hughes, the victim turned in response and told Ms. Reed that he was not bothering her and she should "'get out of [his] face.'" Ms. Hughes also told the police the victim called Ms. Reed a bitch. Ms. Hughes said she saw the defendant had a gun and, after the defendant went to the front door, Ms. Hughes forced her outside. The victim then departed from the bar and told Ms. Hughes he was leaving because he did not want any trouble. She did not see any altercations between the victim and anyone until she heard the gunshots and saw the victim fall to the ground.

Another version of the events came from Benny Alan Mills. Mr. Mills, who is a second or third cousin to the victim, said the defendant and Mr. Miller talked with the victim for about thirty or forty minutes in what appeared to be a friendly conversation and then the victim told Mr. Mills he was "going outside [to] smoke a joint with them[.]" About thirty seconds to a minute later, Mr. Mills stated he "heard a ruckus in the back of bar," so he went to see what was happening. When Mr. Mills got there, the victim told him that Mr. Miller "sucker punched [him] in the side of the head." Mr.

---

2. The exact amount of beer consumed by the group is unclear, but the testimony indicated it was approximately two to three cases. Similarly, the number of Valiums taken by the defendant and Ms. Reed is uncertain, but they testified it was about three to five pills a piece, with each pill being either five or ten milligrams.

Mills claimed he told the victim to take Mr. Miller outside and "whip his ass[.]" The victim, Mr. Mills, and a group of people exited the bar, and Mr. Mills informed the victim he "would watch his back." Mr. Miller and the victim were "wrestling" in preparation to fight when the defendant attempted to break them up. The defendant was shoved down in the process and fired the gun five times killing the victim. Mr. Mills stated he kicked the defendant in the head after she shot the gun and someone grabbed the gun out of her hand and threw it across the parking lot.

Several witnesses had other variations of the events. Some witnesses said the victim and Mr. Miller had an argument inside the bar. One witness said Mr. Miller attempted to start a fight, the victim swung at Mr. Miller and missed, and the victim agreed to leave the bar to prevent trouble. Another witness said that, when the victim was leaving, Ms. Reed said something to him about the defendant and the victim "barely shoved" Ms. Reed out of his way and told Ms. Reed "to keep her G.D. lesbian friend out of his face." Still a further witness described the victim as punching Mr. Miller and backhanding Ms. Reed. One witness who saw the defendant shoot the gun said the defendant continued to pull the trigger after the gun was empty.

Ms. Reed testified at trial that she saw the victim, the defendant, and Mr. Miller arguing when she went outside. Ms. Reed stated she told the victim to leave the defendant "the F alone" and it was then that the victim punched Ms. Reed on the left side of her forehead with his fist. She claimed she "was knocked out" and the next thing she knew was Mr. Church was trying to get her in the car when she heard a shot and she took off up the road. Mr. Church also said Ms. Reed was hit so hard that she flew five or six feet out of his arms and, although he did not see who actually hit her, he said the victim was the only person standing near Ms. Reed.

Roger Mullins, who also was at the scene, stated the victim hit Ms. Reed and then turned toward the defendant and Mr. Miller and "somebody threw something or [Mr. Miller] . . . threw his arms up like he was de-fending hisself, . . . and that's when I started hearing the shots being fired . . . and I seen [the defendant] and then I realized who was firing." When the shots were fired, Mr. Mullins said Ms. Reed was on the ground while the defendant was standing beside her father.

The defendant testified that she remembered getting a gun from her father's house, but she said she did not check to see if it was loaded. She also recalled drinking, taking some Valiums, sitting at a table in Tucky's, going up to the area where her father and the victim were talking inside the bar, the victim's giving Ms. Reed an "evil look," and various other miscellaneous events that occurred prior to the killing. She stated she did not remember leaving Tucky's and she had no independent recollection of the actual shooting. However, she said she recalled her father shook her after the incident and told her she shot the victim. The defendant claimed she was scared after her father told her what had happened, so she and Ms. Reed took off running.

The defendant testified she and Ms. Reed ran across a bridge and hid under a porch for a while. According to the defendant, the two then walked up some railroad tracks and ended up at the house of Clyde Graham, who worked for the Wyoming County Sheriff's Department. Mr. Graham's wife is a distant cousin of Ms. Reed. Mr. Graham said they arrived at his house between 3:00 and 4:00 a.m. The defendant and Ms. Reed asked if they could use the phone, and Mr. Graham told them the deputies were searching for them. The defendant called her sister and told her to have her parents meet them at the jail. A little after 4:00 a.m., Randy Brooks of the Wyoming County Sheriff's Department learned the defendant and Ms. Reed were at Mr. Graham's house. Mr. Brooks went to the house and transported the women to the Wyoming County Jail. Mr. Brooks testified the defendant was coherent and did not appear to be intoxicated.

The victim died at the scene. Medical evidence demonstrated the victim was shot four times of which only one of the wounds

would not have been fatal.[3] An autopsy revealed the victim had a blood alcohol content of .13 percent and alcohol urine content of .30 percent. The victim also had evidence of some marijuana use in his blood stream.

There is no indication in the record that the defendant knew the victim was at Tucky's prior to her seeing him in the bar. The victim was not a regular patron of Tucky's, and he had not been there for several months. Moreover, the victim did not drive himself to the bar, so his vehicle would not have been detected in the parking lot before the defendant entered the establishment. The defendant testified she did not even personally know the victim and had never had a conversation with him. The defendant stated she only heard about the victim's reputation from Ms. Reed and others and what she heard scared her.

The defendant claimed that, when she and Ms. Reed first started their relationship, Ms. Reed told her the victim said he "would get the blonde-headed bitch that lived with her." The defendant further asserted that Ms. Reed informed her the victim used to beat women, including Ms. Reed. The defendant denied being jealous of the victim. Ms. Reed testified the victim smacked and punched her while they were dating and the victim had a

reputation for drinking and fighting. Ms. Reed stated that, shortly after she and the defendant began their relationship,[4] the victim told her "he hated the blonde-headed bitch and he would get her, he would get even with both of us." Ms. Reed claimed she knew there would be trouble at the bar by the look in the victim's eyes.

## II.

## DISCUSSION

On appeal, the defendant principally challenges the sufficiency of the indictment, the sufficiency of the jury qualification procedure, and the sufficiency of the jury instructions. The defendant also argues that four jurors should have been stricken for cause. The defendant raises other arguments, all of which lack merit and do not require elaborate discussion.[5]

### A.

### *Improperly Drafted Indictment*

The defendant argues that her indictment was drafted improperly and its use misinformed the jury. Specifically, she complains the style of the indictment is incorrect under W. Va.Code, 61–2–1 (1991),[6] and W. Va.Code,

---

3. A fifth shot apparently missed the victim.

4. According to Ms. Reed, she and the defendant began their relationship about a year after Ms. Reed stopped dating the victim.

5. The defendant claims the prosecuting attorney made several improper and prejudicial statements. First, the defendant complains the prosecuting attorney made comments that are inconsistent with the evidence and raised the defendant's alleged homosexual lifestyle merely to prejudice the jury against her. Second, the defendant claims the prosecuting attorney improperly elicited and used testimony concerning the defendant's reputation for carrying a gun. Third, the defendant asserts, in giving the State's rebuttal, the prosecuting attorney went beyond the scope of the defense closing. We carefully have reviewed these contentions and expressly find that in the context and setting of this case the arguments did not exceed the boundary that we established in *State v. Sugg*, 193 W.Va. 388, 405–06, 456 S.E.2d 469, 486–87 (1995). Thus, we find no reversible error.

The defendant further states the grand jury was mislead in its deliberations. Specifically,

the defendant contends the prosecuting attorney intentionally omitted evidence which led the grand jury to believe there was no evidence of self-defense. The defendant also alleges the prosecuting attorney used an unsworn statement. We find no merit in these contentions. *See United States v. Williams*, 504 U.S. 36, 51, 112 S.Ct. 1735, 1744, 118 L.Ed.2d 352, 368 (1992) (a rule requiring prosecutors to present exculpatory as well as incriminating evidence to grand juries "would alter the grand jury's historical role, transforming it from an accusatory to an adjudicatory body"); *State v. Clark*, 64 W.Va. 625, 630, 63 S.E. 402, 404 (1908) (an indictment will not be dismissed merely " 'because some illegal evidence was also received.' " (Citations omitted)).

6. W. Va.Code, 61–2–1, provides, in part:

"Murder ... by any willful, deliberate and premeditated killing ... is murder of the first degree....

"In an indictment for murder and manslaughter, it shall not be necessary to set forth the manner in which, or the means by which, the death of the deceased was caused, but it shall be sufficient in every such indictment to charge that the defendant did feloniously, wilfully, malicious-

62–9–3 (1923).[7] In relevant part, the indictment states the defendant

> "committed the offense of 'First Degree Murder' by unlawfully, feloniously, wilfully, maliciously, and deliberately shooting JERRY D. WHITE, with a .38 Caliber Revolver Smith and Wesson, with intent to cause his death, and causing his death, in violation of West Virginia Code 61–2–1 against the peace and dignity of the State."

The defendant argues the indictment only should have "allege[d] the offense of homicide, second degree murder," instead of first degree murder as it is written. The defendant states neither W. Va.Code, 61–2–1, nor W. Va.Code, 62–9–3, provides for raising the offense to first degree murder. Moreover, because the indictment excludes premeditation, the face of the indictment does not even contain the necessary elements of first degree murder.

The defendant claims she was unduly prejudiced by the indictment because the prosecuting attorney read the indictment to the jury during his opening statement, he referred back to the indictment during closing,[8] and the indictment was given to the jury for its deliberations. Although the defendant concedes a proper instruction listing the elements of first degree murder was read to the jury at the close of the evidence, the defendant contends the jurors were faced with the problem of having a proper instruction orally given while an improper definition of first degree murder was before them in written form. The defendant argues the use of the indictment constitutes plain error.

The defendant also states that, although no objections were made during the opening or closing arguments about the prosecutor's re-

marks, the indictment should have been corrected when the defendant moved to dismiss the indictment prior to trial.[9] However, upon review of the motion to dismiss and the transcript of the related hearing, we do not find any argument to dismiss the indictment because it contains an inadequate definition of first degree murder. Instead, the defendant sought to dismiss the indictment because she claimed "intentional misstatements of fact and misleading testimony were presented to the grand jury[.]"

■ Ordinarily, a defendant who has not proffered a particular claim or defense in the trial court may not unveil it on appeal. Indeed, if any principle is settled in this jurisdiction, it is that, absent the most extraordinary circumstances, legal theories not raised properly in the lower court cannot be broached for the first time on appeal. We have invoked this principle with a near religious fervor. This variant of the "raise or waive" rule cannot be dismissed lightly as a mere technicality. The rule is founded upon important considerations of fairness, judicial economy, and practical wisdom. Just recently, we stated in *State ex rel. Cooper v. Caperton*, 196 W.Va. 208, 216, 470 S.E.2d 162, 170 (1996):

> "To preserve an issue for appellate review, a party must articulate it with such sufficient distinctiveness to alert a circuit court to the nature of the claimed defect. The rule in West Virginia is that parties must speak clearly in the circuit court, on pain that, if they forget their lines, they will likely be bound forever to hold their peace.... The forfeiture rule that we apply today fosters worthwhile systemic ends and courts will be the losers if we

---

ly, deliberately and unlawfully slay, kill and murder the deceased."

**7.** W. Va.Code, 62–9–3, states:

"An indictment for murder shall be sufficient if it be in form, tenor or effect as follows (after following the form in section one [§ 62–9–1]):
"That A ............., on the .......... day of .........., nineteen .........., in the said county of .........., feloniously, wilfully, maliciously, deliberately and unlawfully did slay, kill and murder one B .........., against the peace and dignity of the State.

"Upon the trial of such indictment the accused may be convicted of either murder of the first degree, murder of the second degree, voluntary manslaughter, or involuntary manslaughter, as the evidence may warrant."

**8.** Specifically, the prosecuting attorney stated during his closing: "I read the indictment to you. First degree murder."

**9.** The motion to dismiss the indictment is stamped "FILED" on August 22, 1994. Although this date is three days after the jury returned its verdict on August 19, 1994, it is

permit the rule to be easily evaded. It must be emphasized that the contours for appeal are shaped at the circuit court level by setting forth with particularity and at the appropriate time the legal ground upon which the parties intend to rely."

Nevertheless, the "raise or waive" rule, though important, is a matter of discretion. Thus, like most rules, this rule admits of an occasional exception. Exceptions must be few and far between and, therefore, an appellate court's discretion should not be affirmatively exercised unless the equities heavily preponderate in favor of such a step. These principles are embodied in our "plain error" rules.[10]

■ In addition to plain error, appellate consideration of unobjected to error arising from an indictment is limited further by Rule 12(b)(2) of the West Virginia Rules of Criminal Procedure.[11] This rule requires that a defendant must raise any objection to an indictment prior to trial. Although a challenge to a defective indictment is never waived,[12] we literally will construe an indict-

ment in favor of validity where a defendant fails timely to challenge its sufficiency. Without objection, the indictment should be upheld unless it is so defective that it does not, by any reasonable construction, charge an offense under West Virginia law or the specific offense for which the defendant was convicted. Finding no objection on the grounds now espoused by the defendant, we proceed to address the defendant's contention under the above analysis. However, as to the "intentional misstatements of fact and misleading testimony" issue we have dismissed it earlier under the more appellant friendly standard for substantial prejudice.[13]

■ The defendant, in essence, argues the prejudice she suffered as a result of the faulty indictment is demonstrated by the fact she was convicted of first degree murder when there exists no evidence she had a premeditated, specific intent to kill the victim. Although the objection now made is reviewable only for the failure to allege an offense for which the defendant was convict-

clear from the record that issues surrounding the indictment were raised prior to trial and were discussed at a pretrial hearing.

**10.** We set forth the criteria for plain error in Syllabus Point 7 of *State v. Miller*, 194 W.Va. 3, 459 S.E.2d 114 (1995), where we stated: "To trigger application of the 'plain error' doctrine, there must be (1) an error; (2) that is plain; (3) that affects substantial rights; and (4) seriously affects the fairness, integrity, or public reputation of the judicial proceedings." *See also United States v. Olano*, 507 U.S. 725, 732–37, 113 S.Ct. 1770, 1776–79, 123 L.Ed.2d 508, 518–21 (1993); Syl. Pt. 4, *State v. Osakalumi*, 194 W.Va. 758, 461 S.E.2d 504 (1995). In *Miller*, we explained "[t]he 'plain error' doctrine grants appellate courts, in the interest of justice, the authority to notice error to which no objection has been made." 194 W.Va. at 18, 459 S.E.2d at 129. We also stated "[p]lain error warrants reversal 'solely in those circumstances in which a miscarriage of justice would otherwise result.'" 194 W.Va. at 18, 459 S.E.2d at 129, *quoting United States v. Frady*, 456 U.S. 152, 163 n. 14, 102 S.Ct. 1584, 1592 n. 14, 71 L.Ed.2d 816, 827 n. 14 (1982).

**11.** Rule 12(b) provides, in pertinent part:

"*Pretrial Motions.*—Any defense, objection or request which is capable of determination without the trial of the general issue may be raised before trial by motion. Motions may be written

or oral at the discretion of the judge. The following must be raised prior to trial:

\* \* \* \* \* \*

"(2) Defenses and objections based on defects in the indictment or information (other than that it fails to show jurisdiction in the court or to charge an offense which objections shall be noticed by the court at any time during the pendency of the proceedings)[.]"

**12.** As stated in Franklin D. Cleckley, *Handbook on West Virginia Criminal Procedure*, I–687 (1994), *citing Government of Virgin Islands v. Pemberton*, 813 F.2d 626, 631 (3rd Cir.1987):

"Since a jurisdictional defect cannot be waived, the failure of the indictment or information to charge an offense shall be noticed by the court at any time during the pendency of the proceeding. Rule 12(b)(2) properly interpreted means that an objection to an information or indictment on the ground that it fails to charge an offense may be raised for the first time on appeal."

The issue raised in this case, however, is not a jurisdictional defect and should have been raised prior to trial. *See State v. Dyer*, 177 W.Va. 567, 574, 355 S.E.2d 356, 363 (1987) ("No complaint that it failed to plainly inform the appellant of the charges against him was raised until after all the evidence had been submitted. Accordingly, we find no defect on the face of the indictment which would warrant reversal").

**13.** *See* note 5, *supra*.

ed, the failure of the trial court to dismiss the indictment as defective was not error at all. The legal analysis posited by the defendant is dubious at best; thus, we need only spend a brief moment disposing of this issue. The defendant cites us to no authority—let alone any controlling cases of this Court—clearly holding the indictment as written is either prejudicial or defective.

▮▮▮ Keeping in mind the standards set forth above, we first consider whether the indictment was sufficient to allege first degree murder. Generally, the sufficiency of an indictment is reviewed *de novo*. An indictment need only meet minimal constitutional standards, and the sufficiency of an indictment is determined by practical rather than technical considerations. In *Hamling v. United States*, 418 U.S. 87, 117, 94 S.Ct. 2887, 2907, 41 L.Ed.2d 590, 620 (1974), the United States Supreme Court determined that an indictment is constitutionally sufficient if it complies with three requirements: (1) the indictment states the elements of the offense charged; (2) a defendant is put on fair notice of the charge against which he or she must defend; and (3) a defendant is able to assert an acquittal or conviction in order to prevent being placed in jeopardy twice. *See Russell v. United States*, 369 U.S. 749, 763–64, 82 S.Ct. 1038, 1047, 8 L.Ed.2d 240, 250–51 (1962); *State v. Adams*, 193 W.Va. 277, 281 n. 8, 456 S.E.2d 4, 8 n. 8 (1995).

We start with the basic premise that the definition of the elements of a criminal offense is entrusted to the Legislature. Thus, in determining what must be alleged and what is required to prove a criminal violation, the focus of our inquiry is on the intent of the Legislature. Of course, in determining the intent of the Legislature, we must turn to the design and structure of our statutory scheme. A fair and reasonable reading of W. Va.Code, 61–2–1, indicates that in order to allege first degree murder it only is necessary to aver "that the defendant did feloniously, willfully, maliciously, deliberately and unlawfully slay, kill and murder the deceased." Although these words were included in the indictment, the defendant suggests the words "First Degree Murder" were gratuitously and prejudicially included. In addi-

tion, and for reasons not clear to this Court, she maintains the words "the defendant did feloniously, willfully, maliciously, deliberately and unlawfully slay, kill and murder the deceased" are insufficient to permit a first degree murder conviction.

▮▮▮ Criminal statutes, of course, should be narrowly and strictly construed in favor of a defendant in order to conform to constitutional notions of due process. *See United States v. Resnick*, 299 U.S. 207, 57 S.Ct. 126, 81 L.Ed. 127 (1936). Fairness dictates that individuals be able to know, within reason, precisely what conduct is proscribed under a criminal statute. *See Grayned v. City of Rockford*, 408 U.S. 104, 108, 92 S.Ct. 2294, 2298–99, 33 L.Ed.2d 222, 227 (1972); *Smith v. Goguen*, 415 U.S. 566, 574–75, 94 S.Ct. 1242, 1248, 39 L.Ed.2d 605, 612–13 (1974). "Elementary notions of fairness enshrined in our constitutional jurisprudence dictate that a person receive fair notice not only of the conduct that will subject him to punishment but also of the severity of the penalty that a State may impose." *BMW of North America, Inc. v. Gore*, —— U.S. ——, ——, 116 S.Ct. 1589, 1598, 134 L.Ed.2d 809, 826 (1996). (Footnote omitted). A criminal statute also must establish minimum guidelines to prevent law enforcement officials, prosecutors, judges, and juries from pursuing their personal predilection. *Goguen*, 415 U.S. at 575, 94 S.Ct. at 1248–49, 39 L.Ed.2d at 613. Here, however, the language of the statute states the elements of the offense and what must be alleged and, except for inclusion of the words "First Degree Murder," the indictment tracked the statutory language. The only issue we need decide is whether the indictment, which attempts to allege first degree murder, meets our minimum constitutional standards. Our decisions hold that a fundamental principle stemming from Section 5 of Article III of the West Virginia Constitution is that a criminal defendant only can be convicted of a crime charged in the indictment. Incident to this constitutional guarantee is the longstanding principle of our criminal justice system that charges contained in an indictment may not be broadened through amendment, except by the

grand jury itself.[14] *See* Syl. pts. 1 & 2, *Adams, supra.*

■ Reduced to its essence, the defendant's complaint only can be that the word "premeditation" is missing from the indictment. In defining first degree murder, W. Va.Code, 61–2–1, does in fact refer to "any willful, deliberate and premeditated killing[.]" Thus, the defendant boldly declares that both "deliberation and premeditation" are separate but necessary elements of first degree murder and each specifically must be alleged in the indictment. A common maxim of statutory construction is that statutes are to be construed so as to give meaning to every word in them. *Bullman v. D & R Lumber Co.*, 195 W.Va. 129, 133, 464 S.E.2d 771, 775 (1995). However, as the United States Court of Appeals for the Third Circuit in *United States v. Lanni*, 466 F.2d 1102, 1109 (3rd Cir.1972), so aptly noted: " 'We agree to all generalities about not supplying criminal laws with what they omit, but there is no canon against using common sense in construing laws as what they obviously mean.' " (Citation omitted). Obviously, the Legislature determined the word "deliberate" was sufficient to encompass the concept of premeditation. We believe sufficient authority exists to support this conclusion.

■ Under West Virginia law, the terms "deliberate" and "premeditate" are synonymous. As early as seventy-eight years ago, this Court stated in Syllabus Point 3, in part, of *State v. Worley*, 82 W.Va. 350, 96 S.E. 56 (1918), that "[t]he element of premeditation is comprehended in the term *deliberate*, . . . the words, *deliberate* and *premeditate*, being employed in the statute as synonymous terms." (Emphasis in original). In West Virginia, deliberation means the defendant considered the taking of another's life while in a cool and deliberate state of mind. *See State v. Guthrie*, 194 W.Va. 657, 674–75, 461 S.E.2d 163, 180–181 (1995). It is "deliberation" that separates first degree murder from second degree murder. An indictment as drafted is presumed sufficient if it tracks the statutory language, cites the elements of the offense charged, and provides the other essential details, such as time, place, and persons involved, to provide adequate notice to the defendant. The indictment in the present case clearly is sufficient based on these criteria. Moreover, the trial court properly instructed the jury on all the elements of the crime including the requirement of "premeditation." Under these circumstances, we conclude the indictment was not defective and the inclusion of the words "First Degree Murder" was not prejudicial.[15]

### B.

### *Qualification of the Jury*

The defendant next berates the trial court for two ostensible procedural blunders centered around whether the jury properly was qualified. First, the defendant complains the trial judge wrongfully delegated his duties to the circuit clerk. Second, the defendant complains the trial court erred when it failed to remove several potential jurors for cause. These criticisms are unwarranted.

■ In reviewing the qualifications of a jury to serve in a criminal case, we follow a three-step process. Our review is plenary as

---

14. An amendment may be explicit, implicit, or constructive. In deciding whether the trial court's jury instructions on first degree murder amounted to a constructive amendment of the indictment, we must determine whether the instruction permitted the jury to convict the defendant on a factual basis that effectively modified an essential element of the offense charged.

15. Once we have determined the indictment was sufficient to sustain a first degree murder conviction, the additional point raised by the defendant that the inclusion of the words "First Degree Murder" was prejudicial is without merit. At best, the words would be nonprejudicial surplusage. If the defendant was of the belief the surplus language was of some kind of a disadvantage, she, being the only party who can so move, should have moved to strike the language under Rule 7(d) of the West Virginia Rules of Criminal Procedure. ("The court on motion of the defendant may strike surplusage from the indictment or information.") *See United States v. Miller*, 471 U.S. 130, 136, 105 S.Ct. 1811, 1815, 85 L.Ed.2d 99, 105 (1985) ("[a] part of the indictment unnecessary to and independent from the allegations of the offense proved may normally be treated as 'a useless averment' that 'may be ignored.' " (Citation omitted)). Failing to avail herself of this rule, the contention is forfeited.

to legal questions such as the statutory qualifications for jurors; clearly erroneous as to whether the facts support the grounds relied upon for disqualification; and an abuse of discretion as to the reasonableness of the procedure employed and the ruling on disqualification by the trial court.

### 1.

### Improper Jury Selection Procedure

Upon a review of the record, we find no reversible error as to the defendant's first allegation. During jury selection, the trial judge asked the circuit clerk to ask the prospective jurors some general voir dire questions before proceeding to allow questions from counsel. The circuit clerk asked several jury qualification questions while in the presence of the trial judge and counsel. The defendant now complains the circuit clerk had no authority under W. Va.Code, 52-1-8 (1993),[16] and W. Va.Code, 56-6-12 (1923),[17] to ask the questions and the circuit clerk omitted several questions required by W. Va. Code, 52-1-8(b).[18] The defendant did not object to this procedure and did not ask for the additional questions to be read. It is apodictic that we review a trial court's determination as to the scope and method of jury voir dire for an abuse of discretion. *See* W.Va.R.Crim.P. 24(a).

■ We find neither statute cited by the defendant supports her position that a trial judge physically must be the one who reads the questions to the jury. In addition, this assignment of error is without merit for two reasons. First, there was no objection made to the procedure adopted by the trial court. Second, even if there was an objection, we would not reverse a criminal conviction on these grounds alone absent a clear showing of prejudice.

■ The best we can make of the defendant's claim is that a clerk of the circuit court cannot perform an important and critical "judicial" function. To be sure, an officer authorized by Section 5 of Article VIII of the West Virginia Constitution to preside over trials in the circuit courts of this State may not delegate his or her judicial responsibilities. Thus, the issue relating to the clerk's involvement turns on the dispositive question whether the trial judge actually delegated his authority to conduct voir dire. In answering this question and resolving the matter, we find significant guidance from the United States Court of Appeals for the Fourth Circuit and the United States Supreme Court.

In *Gomez v. United States*, 490 U.S. 858, 873, 109 S.Ct. 2237, 2246, 104 L.Ed.2d 923, 937 (1989), the United States Supreme Court examined in detail the role jury selection occupies in a criminal trial, observing that it represents a "critical stage of the criminal proceeding" with voir dire being the "primary means by which a court may enforce a defendant's right to be tried by a jury free from ethnic, racial, or political prejudice[.]" *Citing Rosales–Lopez v. United States*, 451 U.S. 182, 188, 101 S.Ct. 1629, 1634, 68 L.Ed.2d 22, 28 (1981); *Lewis v. United States*, 146 U.S. 370, 374, 13 S.Ct. 136, 137–38, 36 L.Ed. 1011, 1013 (1892).[19] (Other citations omitted). Also, the Supreme Court discussed the degree to which the individual

---

**16.** W. Va.Code, 52-1-8, grants the trial court, upon request or upon its own initiative, the power to determine the qualification of prospective jurors. Subsection (b) of this statute lists several reasons why a prospective juror is disqualified.

**17.** In relevant part, W. Va.Code, 56-6-12, provides:

"Either party in any action or suit may, and the court shall on motion of such party, examine on oath any person who is called as a juror therein, to know whether he is a qualified juror, or is related to either party, or has any interest in the cause, or is sensible of any bias or prejudice therein[.]"

**18.** Specifically, the defendant states the following areas were not addressed: "citizenship, minimum age, residency, literacy, knowledge of the English language, disability of any jurors, service within the last two (2) years on another petit jury, issues of prior criminal convictions causing loss of a right to vote, convictions for perjury, false swearing or other infamous offenses."

**19.** In affirming voir dire as a critical stage of the criminal proceeding, the Supreme Court wrote: " '[W]here the indictment is for a felony, the trial commences at least from the time when the work of empaneling the jury begins.' " *Lewis*, 146 U.S. at 374, 13 S.Ct. at 137, 36 L.Ed. at 1013, *citing Hopt v. Utah*, 110 U.S. 574, 578, 4 S.Ct. 202, 204, 28 L.Ed. 262, 265 (1884).

who conducts voir dire must make sensitive evaluations of "not only spoken words but also [the] gestures and attitudes of all participants to ensure the jury's impartiality," and expressed "serious doubts that a [trial court] could review [these] function[s] meaningfully." 490 U.S. at 874–75, 109 S.Ct. at 2247, 104 L.Ed.2d at 938–39. Based on these observations, the Supreme Court concluded that Congress had not given magistrates the power to conduct jury selection in a felony trial.

Having described the rationale and holding of *Gomez,* we now turn to the task of applying that rationale to the present case. Unlike *Gomez,* we are confronted with a much easier situation that is completely distinguishable. Here, the full voir dire was conducted and completed under the supervision and control of the presiding trial judge. The clerk did not *preside* over voir dire and did not engage in any conduct beyond her duties as a clerk. The clerk was merely the voice for the judge. It was the clerk's voice not the clerk's judgment that was being used. In *United States v. Lee,* 943 F.2d 366, 369 (4th Cir.1991), the Fourth Circuit addressed a similar issue, and its opinion provides further guidance:

> "Several facts in the Lee trial distinguish it from the *Gomez* trial. First, the magistrate judge asked questions prepared by the court in the presence of the judge. Thus, the magistrate judge was merely serving as the judge's 'voice.' Second, the judge did not 'delegate' voir dire to the magistrate judge; accordingly, he was present, with one exception, throughout the proceeding."

The facts are even more favorable in the case *sub judice.* The trial judge was present throughout the entire trial. All questions, whether read by the clerk or asked by counsel, were under the supervision of the trial judge. It was the trial judge alone who ruled on objections and determined who was qualified to serve. Under these circumstances, we cannot find any constitutional infirmities.

■ Our decision to reject the constitutional claim of the defendant is buttressed further by the failure of the defendant to register an objection below. The United States Supreme Court has ruled that a defendant has no constitutional right to have a constitutional judge preside at jury selection if he or she raised no objection to the judge's absence. *Peretz v. United States,* 501 U.S. 923, 937, 111 S.Ct. 2661, 2669, 115 L.Ed.2d 808, 822 (1991). The Supreme Court suggested that criminal litigants, like those in civil trials, may waived their personal rights. "Just as the Constitution affords no protection to a defendant who waives [or forfeits] these fundamental rights, so it gives no assistance to a defendant who fails to demand the presence of [a constitutional] judge at the selection of [the] jury." 501 U.S. at 937, 111 S.Ct. at 2669, 115 L.Ed.2d at 822. We need not decide whether a criminal defendant can waive or forfeit the right to have the trial judge preside over jury selection under the West Virginia Constitution. This issue is not before us. We do hold that in the absence of a contemporaneous objection, a defendant forfeits on appeal the right to complain that the circuit clerk asked questions of the jury. Of course, even had there been a timely objection, we would find no error under the circumstances of this case.

■ The notion that a trial judge literally read voir dire questions to a jury always has been short on justification. Trial judges have broad discretion in how to manage a trial, and the procedure complained of by the defendant falls squarely within a trial judge's management discretion. To succeed on an abuse of discretion claim regarding the judicial management of a criminal trial, a defendant must point to a specific rule or statutory violation and then must show the measures or procedures taken by the trial judge either actually or inherently were prejudicial. Of course, the defendant has shown neither a rule or statutory violation nor actual prejudice. The defendant has presented no evidence that any jurors who were not stricken for cause were, in fact, statutorily disqualified.

■ To decide whether allowing a circuit clerk to read voir dire questions is inherently prejudicial, we consider whether the procedure created the potential that jurors would take less seriously their answers to voir dire

questions, thereby presenting an unacceptable risk of disqualified persons serving on the jury. We believe a jury would view the circuit clerk's questions as ordinary and normal in jury selection proceedings. Circuit clerks in West Virginia have regular contact with jurors, and much of this contact centers on the clerk asking or answering questions about juror service. If circuit clerks are qualified to arrange for the presence of jurors in the courtroom, to call the roll, and to give jurors their oath, we have difficulty understanding how asking jurors statutory questions is prejudicial to a criminal defendant. More significantly, "the Court in *Gomez* relied on the distinction between voir dire, which is the jurors' 'first introduction to the substantive factual and legal issues in a case,' and a mere 'administrative impanelment process.' *Gomez, supra,* 490 U.S. at 874–75, 109 S.Ct. at 2246–47 [104 L.Ed.2d at 938–39]." *United States v. Williams,* 927 F.2d 95, 97 (2nd Cir.), *cert. denied* 502 U.S. 911, 112 S.Ct. 307, 116 L.Ed.2d 250 (1991). The questions the clerk asked did not "expos[e] any jurors to the substance of the case [as] part of the 'administrative impanelment process,' and any error in this procedure was harmless." *Williams,* 927 F.2d at 97. Mindful that case management is a matter within the ken of the trial court, we cannot say the procedure presented was so inherently prejudicial as to impose an unacceptable threat to the defendant's right to a fair trial.

 Second, West Virginia trial judges are accorded ample discretion in determining how best to conduct voir dire. *State v. Derr,* 192 W.Va. 165, 172–75, 451 S.E.2d 731, 738–41 (1994). As a general rule, we will find an abuse of discretion only when there is insufficient questioning to allow defense counsel to exercise a reasonably knowledgeable challenge to unqualified jurors. *See* Syl. pt. 2, *State v. Mayle,* 178 W.Va. 26, 357 S.E.2d 219 (1987). Nevertheless, a defendant's right to an impartial jury includes the right to an adequate voir dire to identify unqualified jurors. *See Morgan v. Illinois,* 504 U.S. 719, 729–30, 112 S.Ct. 2222, 2230, 119 L.Ed.2d 492, 503 (1992); Syl. pt. 4, *State v. Peacher,* 167 W.Va. 540, 280 S.E.2d 559 (1981). Voir dire must be probing enough to reveal jurors' prejudices regarding issues that may arise at trial so that counsel may exercise their challenges in an informed manner.

The defendant fails to state how she was prejudiced by the circuit clerk's failure to ask several of the general voir dire questions listed in W. Va.Code, 52–1–8(b). Moreover, it is difficult to perceive how the right to an adequate voir dire can be denied when, given the opportunity, a defendant fails to request additional or supplementary voir dire questions. We believe it is incumbent on a defendant to bring to the trial court's attention any deficiency in the voir dire that might impair the prospects of a fair trial. Indeed, there was nothing that prevented the defendant from asking these very questions on her own behalf during voir dire if she perceived a problem with one of the potential jurors. In *State v. Beckett,* 172 W.Va. 817, 823, 310 S.E.2d 883, 889 (1983), we suggested that where a defendant does not seek additional voir dire to demonstrate possible bias, prejudice, or disqualification, there can be no error for the failure to strike prospective jurors for cause. *See also State v. Ward,* 188 W.Va. 380, 393, 424 S.E.2d 725, 738 (1991). In *Derr,* 192 W.Va. at 175, 451 S.E.2d at 741, in ruling that the trial court had not abused its discretion, we stated:

"The trial court gave defense counsel an adequate opportunity to address his concern with regard to the media coverage, but counsel choose not to pursue it. Defense counsel did not object to the jurors being qualified, and we do not find anything in the record that suggests that they were not qualified to serve."

For these reasons and because the defendant failed to object to either the procedure used or to the omission of certain questions, we hold the defendant failed to demonstrate her entitlement to a new trial.

### 2.

### Challenges for Cause

The defendant also assails the failure of the trial court to remove for cause several potential jurors. The defendant states two of the potential jurors should have been removed for cause because they expressed

opinions that they could not render an unbiased decision. According to the defendant, the first of these individuals "believed a person could not be charged without being guilty." The other individual "repeatedly stated that she did not believe that intoxication could reduce culpability and indicated that homosexuals may be more violent or criminally inclined than heterosexuals."

■ After reviewing portions of the transcripts cited by the defendant, we find no merit to her allegations. When asked whether she thought an individual could be indicted for a crime without being guilty, the first prospective juror responded: "I would hope they couldn't be." Upon additional questioning, the prospective juror expressed the opinion that if she believed someone was not guilty she would have no problem returning a not guilty verdict. Defense counsel did not ask the trial court to remove this prospective juror for cause, and she served as a juror in the case.

■ The second individual was a prospective alternate juror. The State concedes this prospective juror gave inconsistent responses to questions asked of her regarding intoxication as a defense. For instance, initially the prospective juror expressed the opinion she believed an individual could not be so drunk to negate premeditation, but then she said she would not ignore the factor if the trial court instructed her on the issue. Defense counsel requested the trial court to remove the prospective juror for cause. The trial court refused. The juror ultimately was peremptorily struck.[20]

■ Similarly, the defendant states a third prospective juror should have been struck for cause because the prospective juror expressed an opinion that he did not believe alcohol should be used as an excuse for hurting someone. This potential juror had a cousin who had been stabbed and was in a wheelchair, which incident the prospective juror attributed to alcohol consumption,

and the prospective juror did not know who had the burden to prove intoxication. However, the prospective juror said he could return a verdict based on the trial judge's instructions and he could set aside his own beliefs. Upon questioning by defense counsel, this prospective juror indicated he "probably" could render a verdict that the defendant was not guilty of first degree murder if the evidence demonstrated the defendant was at a certain level of intoxication, as instructed by the trial judge. Defense counsel moved to strike for cause, but the trial judge denied the motion stating, in part:

"His first answer was he didn't know who would have to prove that. Since you were her lawyer you ought to help her, I think, is what he said. He has indicated his willingness to put aside the thought of alcohol and try to render a fair verdict and that he would listen to the instructions of the Court."

This prospective juror was peremptorily struck.[21]

■ The defendant complains about two other prospective jurors who exhibited underlying prejudices towards homosexuals. The first of these prospective jurors said he was "one hundred percent" against homosexuality. However, he also said he would adhere to the evidence and he believed a homosexual was less likely to commit a violent crime. Defense counsel's motion to strike this prospective juror for cause was denied. This prospective juror was not selected to serve.

The next juror the defendant challenged on this basis expressed strong feeling that he believed homosexuality is wrong and a homosexual is in need of reform. However, he also said he did not think a homosexual was more likely to commit a crime, he would adhere to the evidence in deciding the case, and he would render a fair and impartial decision. Defense counsel's motion to strike this prospective juror for cause was denied.

**20.** There were three potential alternate jurors. The State and the defendant were each permitted to strike one. The record does not reveal which side struck this particular individual.

**21.** As with the alternate jurors, the trial transcript does not indicate, with the exception of the one prospective juror, which prospective jurors were struck by the State and which were struck by defense counsel. It only reveals which jurors were left to serve.

This prospective juror did not serve on the jury.

■■■■ The trial court has broad discretion in determining whether to strike jurors for cause, and we will reverse only where actual prejudice is demonstrated.[22] *See State v. Phillips*, 194 W.Va. 569, 588–90, 461 S.E.2d 75, 94–96 (1995). We conclude the trial court did not err in deciding the two prospective jurors with underlying prejudice towards homosexuals were not unduly biased or prejudiced. The relevant test for determining whether a juror is biased is "whether the juror[ ] ... had such fixed opinion that [he or she] could not judge impartially the guilt of the defendant" *Patton v. Yount*, 467 U.S. 1025, 1035, 104 S.Ct. 2885, 2891, 81 L.Ed.2d 847, 856 (1984). (Citations omitted). We give special deference to the trial court's decision of juror bias because of its broad discretion in this area. In spite of the jurors' statements, we are not persuaded that their views were so "fixed" that they would not honor their oath faithfully to apply the law. We must pay due respect to the oath taken by the jurors given the absence of any stated intention to disregard it. Indeed, the possession of such views expressed by these jurors does not immediately translate into an unwillingness to abide by the oath one takes as a juror.

■■■■ In determining whether a juror should be excused, our concern is whether the juror holds a particular belief or opinion that prevents or substantially impairs the performance of his or her duties as a juror in accordance with the instructions of the trial court and the jurors' oath. *Wainwright v. Witt*, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841, 851–52 (1985); *Phillips*, 194 W.Va. at 588, 461 S.E.2d at 94. A juror is impartial if he or she can lay aside any previously formed impression or opinion of the parties or the merits of the case and can render a verdict based on the evidence presented at trial. *Irvin v. Dowd*, 366 U.S. 717, 723, 81 S.Ct. 1639, 1643, 6 L.Ed.2d 751, 756 (1961). However, the trial court should not rely simply on the jurors' subjective assertions of their own impartiality. *Davis v. Wang*, 184 W.Va. 222, 400 S.E.2d 230 (1990) (trial court relied too heavily on juror's assurance of impartiality). Even though a juror swears that he or she could set aside any opinion he or she might hold and decide the case on the evidence, a juror's protestation of impartiality should not be credited if other facts in the record indicate to the contrary.

■■■■ Concededly, a trial court must grant a challenge for cause if a prospective juror's actual prejudice or bias is shown. *State v. Ashcraft*, 172 W.Va. 640, 647, 309 S.E.2d 600, 607 (1983), *quoting State v. McMillion*, 104 W.Va. 1, 8, 138 S.E. 732, 735 (1927). A trial judge "has a serious duty to determine the question of actual bias[.]" *See Dennis v. United States*, 339 U.S. 162, 168, 70 S.Ct. 519, 521, 94 L.Ed. 734, 740 (1950). Actual bias can be shown either by a juror's own admission or by proof of specific facts which show the juror has such a prejudice or connection with the parties at trial that bias is presumed. Here, the trial court and counsel thoroughly examined the prospective jurors regarding their potential for bias, and, when asked, the prospective jurors at issue indicated they would be able to view the evidence and decide the case without bias.

■■■■ In the final analysis, a trial court is entitled to rely upon its self-evaluation of allegedly biased jurors in determining actual juror bias. "Moreover, even if there were some risk of prejudice, here it is of the type

---

22. *See, e.g., Thompson v. Keohane,* ⸻ U.S. ⸻, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995). In this recent case, the United States Supreme Court explained that "juror impartiality" is a "factual issue," the resolution of which "depends heavily on the trial court's appraisal of witness credibility and demeanor." ⸻ U.S. at⸻, 116 S.Ct. at 464–65, 133 L.Ed.2d at 393. (Citation omitted). The Supreme Court further noted: "This Court has reasoned that a trial court is better positioned to make decisions of this genre, and has therefore accorded the judgment of the jurist-observer 'presumptive weight.' " ⸻ U.S. at ⸻, 116 S.Ct. at 465, 133 L.Ed.2d at 393–94. (Citation omitted). Although arising in the context of 28 U.S.C. § 2254(d) (federal habeas corpus), *Thompson's* reasoning is equally applicable here. *See Patton v. Yount,* 467 U.S. 1025, 1038, 104 S.Ct. 2885, 2892, 81 L.Ed.2d 847, 858 (1984) ("[a]s we have said on numerous occasions, the trial court's resolution of [juror bias] questions is entitled, *even on direct appeal,* to 'special deference,' " (Citation omitted; emphasis added)).

that [conceivably could have been] cured with proper instructions [as to the jurors' duty], and juries are presumed to follow their instructions." *Zafiro v. United States,* 506 U.S. 534, 540, 113 S.Ct. 933, 939, 122 L.Ed.2d 317, 326 (1993). (Citation and internal quotation marks omitted). The trial court is in the best position to judge the sincerity of a juror's pledge to abide by the court's instructions; therefore, its assessment is entitled to great weight. *Phillips,* 194 W.Va. at 590, 461 S.E.2d at 96 ("[g]iving deference to the trial court's determination, because it was able to observe the prospective jurors' demeanor and assess their credibility, it would be most difficult for us to state conclusively on this record that the trial court abused its discretion").

 To be clear, this Court is greatly troubled by the fact that jurors who indicated negative personal opinions about the defendant's sexual orientation were permitted to serve over a challenge for cause. Indeed, we have ruled the injection of these types of issues into a trial would warrant reversal of the conviction on those grounds alone. *See Guthrie,* 194 W.Va. at 681, 461 S.E.2d at 187 ("[a]ppellate courts give strict scrutiny to cases involving the alleged wrongful injection of race, gender, or religion in criminal cases"). However, in cases where the evidence does not otherwise suggest that a juror's protestation of impartiality should not be credited because other facts in the record indicate to the contrary, we, as an appellate court, are not to decide whether we would have made the same determination but whether the trial court abused its discretion. *See United States v. Barber,* 80 F.3d 964, 967 (4th Cir.1996). More significantly, the challenging party bears the burden of persuading the *trial court* that the juror is partial and subject to being excused for cause. Guided by these precepts, an appellate court only

should interfere with a trial court's discretionary ruling on a juror's qualification to serve because of bias when it is left with a clear and definite impression that a prospective juror would have been unable faithfully and impartially to apply the law. In this case, neither the burden of production nor the burden of persuasion was met.

C.

*Malice and Self Defense Instructions*

The defendant raises two issues with regard to jury instructions. First, the defendant argues the trial court gave an improper instruction as to malice. Second, the defendant asserts the trial court erred by failing to give a clear instruction on self defense.

The defendant states that at no time was the jury given a formal instruction or definition of malice and the necessity of a specific intent to kill. Instead, the State offered and, over the defendant's objection, the trial court read the following instruction:

"STATE'S INSTRUCTION NO. 2

"The Court instructs the jury that in a prosecution for murder, if the State proves beyond a reasonable doubt that the defendant, without lawful justification, excuse or provocation, fired a deadly weapon in the direction where a person was located then from such circumstances it may be inferred that the defendant acted with malice and the intent to kill."

The defendant argues this instruction violates the principles set forth by this Court in *State v. Mayo,* 191 W.Va. 79, 443 S.E.2d 236 (1994), and *State v. Jenkins,* 191 W.Va. 87, 443 S.E.2d 244 (1994).

The defendant contends the instruction we found to be erroneous in *Jenkins* is very similar to the instruction the trial court gave in the present case.[23] Moreover, the defen-

---

**23.** The instruction at issue in *Jenkins,* 191 W.Va. at 91 n. 4, 443 S.E.2d at 248 n. 4, states:

"The Court instructs the jury that to convict one of murder, it is not necessary that malice should exist in the heart of the defendant, Ronnie Wayne Jenkins, against the deceased. If the jury believes from the evidence that the defendant, Ronnie Wayne Jenkins, was guilty of shooting with a deadly weapon, such as a

.30—.30 rifle, the deceased and of killing him, the intent, the malice and the wilfulness, deliberation and premeditation may be inferred from the act, and such malice may not be directed against any particular person, but such acts by Ronnie Wayne Jenkins have shown a heart regardless of social duty and fatally bent on mischief.

dant asserts the instruction is improper under Syllabus Point 5 of *Mayo, supra,* where we held an instruction is unconstitutional if it provides a presumption of a material element of a charged offense.

The defendant insists there is no evidence of premeditation, deliberation, or malice but, instead, the evidence is more consistent with the defendant acting out of fright or in the heat of passion. The defendant argues that without the instruction giving the jury the right to infer malice from the use of the gun it is doubtful the jury would have convicted her of anything more than voluntary manslaughter. In addition, the defendant urges this Court to declare the instruction unconstitutional because it had the effect of shifting the burden of proof and relieved the State of proving a critical element of the crime.

In response, the State claims that, contrary to the defendant's argument, the term "malice" was defined for the jury.[24] In addition, the State asserts that State's Instruction No. 2 does not shift the burden of proof to the defendant and it is constitutionally permissible to infer malice from the use of a deadly weapon if the jury finds there are no mitigating factors. Finally, although the defendant did object to the instruction under *Mayo* and *Jenkins,* the State contends the defendant did not object to the instruction on the grounds there was no evidence of motive, premeditation, deliberation, malice, or a specific intent to kill and, therefore, the alleged error should be waived. Upon a review of the record, we find the defendant's objection to the instruction is sufficient to merit review by this Court. Thus, we proceed to examine whether the instruction itself is improper.

■ In general, the question on review of the sufficiency of jury instructions is whether the instructions as a whole were sufficient to inform the jury correctly of the particular law and the theory of defense. We ask whether: (1) the instructions adequately stated the law and provided the jury with an ample understanding of the law, (2) the instructions as a whole fairly and adequately treated the evidentiary issues and defenses raised by the parties, (3) the instructions were a correct statement of the law regarding the elements of the offense, and (4) the instructions meaningfully conveyed to the jury the correct burdens of proof. Thus, a jury instruction is erroneous if it has a reasonable potential to mislead the jury as to the correct legal principle or does not adequately inform the jury on the law. An erroneous instruction requires a new trial unless the error is harmless. *See State ex rel. Grob v. Blair,* 158 W.Va. 647, 214 S.E.2d 330 (1975).

■ In this case, the trial court's instruction easily passes all hurdles. The primary contention of the defendant is that the above instruction violates the precedent and rule of law established in *Mayo* and *Jenkins* in that it shifts to the defendant the burden of disproving malice. This asseveration is profoundly flawed two-fold. First, the defendant's reliance on *Mayo* is completely misplaced. *Mayo* merely reaffirms this State's

" 'Therefore, if after fully and carefully considering all the evidence in this case, the jury believes beyond a reasonable doubt that Ronnie Wayne Jenkins committed the crime of "murder in the first degree" by shooting with a deadly weapon the deceased, then Ronnie Wayne Jenkins may be found guilty of murder in the first degree of Billy Joe Adkins, *as set forth in the indictment.'* (Citation omitted; emphasis in original)."

**24.** The following three instructions were offered and read to the jury:

"DEFENDANT'S INSTRUCTION NO. 16
 "It is the element of malice which forms the critical distinction between murder and voluntary manslaughter. Voluntary manslaughter arises from the sudden heat of passion, while murder is from the wickedness of the heart.
 "Voluntary manslaughter involves an intentional killing but upon sudden provocation and in the heat of passion."
"DEFENDANT'S INSTRUCTION NO. 18
 "The State is not relieved of any burden of proof. To convict a Defendant of first degree murder, the State must still show that the Defendant had a conscious intent to kill at the time she executed that intent."
"DEFENDANT'S INSTRUCTION NO. 26
 "The intent to kill, or malice, is a required element of both first and second degree murder. Malice must exist against the deceased in either case. But the distinguishing feature for first degree murder is the existence of premeditation and deliberation."

608

commitment to the constitutional principle that "presumptions" are unconstitutional when directed against a criminal defendant. Specifically, in Syllabus Point 5, we stated: " 'In a criminal prosecution, it is constitutional error to give an instruction which supplies by presumption any material element of the crime charged.' Syllabus, *State v. O'Connell,* 163 W.Va. 366, 256 S.E.2d 429 (1979)." In *O'Connell,* this Court relied on the constitutional rule established in *Sandstrom v. Montana,* 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979); *see also Francis v. Franklin,* 471 U.S. 307, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1985); *Yates v. Evatt,* 500 U.S. 391, 111 S.Ct. 1884, 114 L.Ed.2d 432 (1991). In *Sandstrom,* the United States Supreme Court held that such burden-shifting by presumption violates the Due Process Clause of the United States Constitution. 442 U.S. at 520–21, 99 S.Ct. at 2457, 61 L.Ed.2d at 48–49. It is unconstitutional to shift the burden of proving an element of a crime to the defendant. It lifts from the State the burden it must bear and then it puts the burden upon the accused, who constitutionally should not suffer under it. "[T]he Fourteenth Amendment's guarantees prohibit a State from shifting to the defendant the burden of disproving an element of the crime charged." *Sandstrom,* 442 U.S. at 527, 99 S.Ct. at 2461, 61 L.Ed.2d at 53. (Rehnquist, J., concurring).

The concept specifically was applied to presumed malice instructions in *Francis, supra,* where the Supreme Court held a mandatory rebuttable presumption violates the Due Process Clause. 471 U.S. at 317, 105 S.Ct. at 1972, 85 L.Ed.2d at 355. In *Yates, supra,* the Supreme Court again found a mandatory rebuttable presumption unconstitutional. Unlike the instruction involved in this case, in *Yates,* the instruction told the jury to presume malice either from an unlawful act, like a killing, or from the use of a deadly weapon, and the Supreme Court warned that we should not assume such unconstitutional instructions are harmless. 500 U.S. at 402, 111 S.Ct. at 1892–93, 114 L.Ed.2d at 448–49.

The language of *Mayo* and *State v. Starkey,* 161 W.Va. 517, 244 S.E.2d 219 (1978),[25]

refutes the contention of the defendant that an instruction that merely permits a permissible inference of malice is unconstitutional. In note 9 of *Starkey,* 161 W.Va. at 528, 244 S.E.2d at 226, we upheld the following instruction: "The court instructs the jury that malice and intent can be inferred by the jury from the defendant's use of a deadly weapon, under circumstances which you do not believe afforded the defendant excuse, justification or provocation for his conduct." We explained this instruction is not constitutionally impermissible because it does not contain "mandatory language of a presumptive or conclusive finding" and, more importantly, because "the inference does not even arise unless the jury find[s] an absence of circumstances which 'afforded the defendant excuse, justification or provocation for his conduct.' " 161 W.Va. at 528–29, 244 S.E.2d at 226. Therefore, we found the instruction was not binding upon the jury, and we found it did not shift the burden of proof to the defendant. 161 W.Va. at 529, 244 S.E.2d at 226. In *Mayo,* 191 W.Va. at 86, 443 S.E.2d at 243, we said:

"In *Starkey,* the State used an instruction to advise the jury that 'malice and intent can be inferred ... from the defendant's use of a deadly weapon[.]' The purpose of the instruction was to advise the jury as to how criminal intent could be determined. We found the instruction not to be unconstitutional because the use of the word 'inferred' rather than 'presumed' did not make it a burden-shifting instruction." (Footnote omitted; ellipsis in *Mayo*).

Thus, the instruction in this case was not unconstitutional nor did it any way offend or conflict with our holding in *Mayo.*

■ Second, we reach the same conclusion as to the *Jenkins* argument. The defendant argues that permitting a jury to infer intent to kill and malice when there is evidence of a legal excuse, justification, or provocation conflicts with the holding in *Jenkins.* However, a proper understanding of *Jenkins* shows the instruction here and the holding of *Jenkins* are quite consistent. The language

**25.** *Overruled on other grounds, Guthrie, supra.*

in *Jenkins* was very carefully crafted by the Court, and we refuse to give *Jenkins* an over-expansive reading. Indeed, our prior cases have made clear that *Jenkins* must be limited to its very words.[26] The reach of *Jenkins* can be limited to three salient points: (a) The use of a deadly weapon does not alone support an inference of "premeditation and deliberation," 191 W.Va. at 93, 443 S.E.2d at 250, and, therefore, it is erroneous to instruct the jury that intent, wilfulness, deliberation, and premeditation may be inferred from the use of a deadly weapon "where there is evidence that the defendant's actions were based on some legal excuse, justification, or provocation." 191 W.Va. at 95, 443 S.E.2d at 252; (b) "[a]n instruction which informs the jury that it may find the defendant guilty of first degree murder if it finds that he used a deadly weapon to kill the deceased unconstitutionally shifts the burden of proof." Syl. pt. 8, *Jenkins;* and (c) when an impermissible burden-shifting instruction is given, the error likely is not to be harmless. 191 W.Va. at 98–99, 443 S.E.2d at 255–56.

The instruction complained of here in no way approximates the burden-shifting instruction in *Jenkins* for two reasons. First, the inference went only to malice and intent to kill, not to premeditation and deliberation. Second, the inference was a permissible one, not a conclusive one as found in *Jenkins,* 191 W.Va. at 96, 443 S.E.2d at 253, where we stated:

"The impact of the last portion of the State's instruction reduces the ultimate question of the defendant's guilt to this statement: '[I]f ... the jury believes beyond a reasonable doubt that ... [the defendant] committed the crime of murder in the first degree by shooting with a deadly weapon the deceased, then ... [the defendant] may be found guilty of murder in the first degree[.]' Putting aside the fact that

the sentence is a tautology, i.e., by committing the crime of murder by a deadly weapon, the defendant may be found guilty of murder, the jury's deliberation is focused on a single fact—the shooting with a deadly weapon. All other elements of first degree murder are subsumed in this one finding. The jury is not asked to infer or presume, but, in effect, is told if the deceased was shot with a deadly weapon, then first degree murder occurred."

In *Jenkins,* the instruction permitting a finding first degree murder from the use of a firearm essentially told the jury to reject all defenses. Thus, by destroying the defendant's theory of the case, the prosecution was relieved of its constitutional obligation to prove premeditation and deliberation beyond a reasonable doubt. Clearly, this situation is not the case *sub judice.* The jury was given a permissive choice whether to infer malice. The choice could be exercised only if the prosecution established the absence of excuse, justification, or provocation beyond a reasonable doubt.

The defendant's theory of the case was that the killing was either accidental, *i.e.,* "I did not know the gun was loaded," or incapacity due to intoxication, *i.e.,* "I do not recall what happened because of the drugs and alcohol," or self-defense. We agree with the defendant that these defenses are incompatible with malice. For example, a "malicious accident" is an oxymoron. However, it was up to the jury to determine whether any of these defenses were credible. We do not believe that merely telling a jury it may infer malice "if the State proves beyond a reasonable doubt that the defendant, without lawful justification, excuse or provocation fired a deadly weapon" is error of a constitutional dimension.

Wisely, the defendant does not challenge the rationality of the inference[27] nor does

---

26. In *State v. Bradshaw,* 193 W.Va. 519, 543–45, 457 S.E.2d 456, 480–82 (1995), we rejected the very argument presented here. We suggested that the defendant in *Bradshaw* misconstrued *Jenkins* when he contended the inference of malice instruction was no longer permitted under West Virginia law. Moreover, we held that as long as a trial court does not unreasonably restrict closing argument, the court is not required

"to walk through the paradigm of *Jenkins* " in its instructions. 193 W.Va. at 544, 457 S.E.2d at 481.

27. We recognize there must be a rational connection between an " 'inferred fact' and one proved at trial so that an instruction on the inference will not skew the jury's deliberations away from reality." Ronald J. Allen, *Structuring*

she contend the instruction was an improper comment on the evidence. In *County Court of Ulster County, New York v. Allen,* 442 U.S. 140, 157, 99 S.Ct. 2213, 2225, 60 L.Ed.2d 777, 792 (1979), the Supreme Court stated:

> "Because this permissive [inference] leaves the trier of fact free to credit or reject the inference and does not shift the burden of proof, it affects the application of the 'beyond a reasonable doubt' standard only if, under the facts of the case, there is no rational way the trier could make the connection permitted by the inference. For only in that situation is there any risk that an explanation of the permissible inference to a jury, or its use by a jury, has caused the presumptively rational factfinder to make an erroneous factual determination."

The premise upon which we sanction the use of this instruction is that it makes more likely an accurate jury verdict by permitting the jury to understand the implications of certain facts proven at trial. More significantly, this instruction also works for the defendant's benefit as well in that it limits the circumstances under which the inference may be considered.

 In instructing a jury as to the inference of malice, a trial court must prohibit the jury from finding any inference of malice from the use of a weapon until the jury is satisfied that the defendant did in fact use a deadly weapon. If the jury believes, however, there was legal justification, excuse, or provocation, under *Jenkins,* the inference of malice does not arise and malice must be established beyond a reasonable doubt independently without the aid of the inference. In this connection, if requested by a defendant, the trial court must instruct the jury that the defendant has no obligation to offer evidence on the subject and the jury may not draw any inference from the defendant's silence.[28] Finally, trial courts must understand that an "inference" of malice instruction is not required but is entirely a discretionary decision of the trial court. *See Bradshaw,* 193 W.Va. at 544, 457 S.E.2d at 481 ("[a] judge need not deliver instructions describing all valid legal principles ..., especially when the principle in question describes a permissible ... inference"). Once a trial judge decides to give such an instruction, the judge must give an instruction that is complete and fair to both sides and any inference the jury draws should result from the reasoning process of the jury and not merely from the trial court calling a permissive inference to the jury's attention.

 A trial judge's instructions to a jury as to the law and how the evidence should be assessed are crucial to a fair trial. Instructions should guide a jury's deliberations and are not mere technicalities in our legal system. Errors in such matters may go to the heart of the question of guilt. In *Guthrie,* 194 W.Va. at 672, 461 S.E.2d at 178, we stated:

> "The purpose of instructing the jury is to focus its attention on the essential issues of the case and inform it of the permissible ways in which these issues may be resolved. If instructions are properly delivered, they succinctly and clearly will inform the jury of the vital role it plays and the decisions it must make. As we said in note 20 of *State v. Miller,* 194 W. Va. at [15], 459 S.E.2d at [126]: Without [adequate] instructions as to the law, the jury becomes mired in a factual morass, unable

*Jury Decisionmaking in Criminal Cases: A Unified Constitutional Approach to Evidentiary Devices,* 94 Harv. L.Rev. 321, 350–53 (1980). It is too late in the day, however, to question the rationality of the inference of malice from the unexcused, unjustified, and unprovoked use of a deadly weapon.

**28.** It is axiomatic that a defendant constitutionally cannot be required to come forward with a defense unless the prosecution meets its burden of proof. The accused "may remain inactive and

secure, until the prosecution has taken up its burden and produced evidence and effected persuasion[.]" 9 John H. Wigmore, *Wigmore on Evidence* § 2511 at 530 (Chadbourn rev.1981). Due to the fact that we do not know whether the prosecution has met its burden of persuasion until there is a verdict, then allowing the prosecution to discharge this burden by means of an instruction based on a defendant's failure to defend would be inconsistent with the presumption of innocence.

to draw the appropriate legal conclusions based on the facts."

Based on this assignment of error, we, however, find no error.

■ The defendant next argues the trial court failed to properly instruct the jury on the issue of self defense. Specifically, the defendant asserts her Instruction Number 1 and Instruction Number 4 [29] and the State's Instruction Number 5 [30] should have been given. The defendant concedes there was no objection made with respect to the trial court's failure to give a self defense instruction, but she argues the failure to do so constitutes plain error. Without these instructions, the defendant maintains there was no clear instruction to the jury as to self defense, as to consideration of the weights and strengths of the parties, and as to consideration of defense of another. We find the defendant not only did not object but she withdrew her instructions numbered 1 and 4. By voluntarily withdrawing these instructions, the defendant waived this assignment of error; waiver necessarily precludes salvage from appellate review under plain error. *See Miller*, 194 W.Va. at 18, 459 S.E.2d at 129. Moreover, contrary to the defendant's assertion in her brief, State's Instruction No. 5 was given. We find no error in reference to State's Instruction No. 5.

## D.

### Ineffective Assistance of Counsel

■ The defendant asserts she received ineffective assistance of counsel. Ineffective assistance claims raised on direct appeal are presumptively subject to dismissal. *Miller*, 194 W.Va. at 14–17, 459 S.E.2d at 125–28. Such claims should be raised in a collateral proceeding rather than on direct appeal to promote development of a factual record sufficient for effective review. The defendant's appeal on her ineffective assistance claim is denied without prejudice to her right to reassert this claim in a collateral proceeding.[31]

---

29. The defendant's instructions state:

"DEFENDANT'S INSTRUCTION NO. 1
"If the Defendant, Angela Dawn Miller, had a reasonable ground to believe that she was in danger of bodily harm from Jerry White, then she was justified in shooting the decedent. This justification is commonly known as self defense.

"It is not essential to this right of self defense that the danger did, in fact, exist, but only that Angela Dawn Miller had a reasonable ground to believe this danger existed.

"If it reasonably appeared to Angela Dawn Miller that the danger in fact existed, she had the right to defend against.

"If you find, from the evidence in this case, that Angela Dawn Miller had such a reasonable ground to believe that she was in danger of bodily harm from Jerry White, then you should find the Defendant, Angela Dawn Miller, not guilty."

"DEFENDANT'S INSTRUCTION NO. 4
"You are instructed that on the issue of whether or not the Defendant believed herself to be in danger of great bodily harm, you should consider the relative strength and size of the parties."

30. The State's instruction provides:

"STATE'S INSTRUCTION NO. 5
"The right of self-defense may be exercised on behalf of another. What the defendant may lawfully do in defense of herself, when threatened with death or great bodily harm, she may do in behalf of another; but if the other person was at fault in provoking an assault, the other person must retreat as far as she or he safely can, before the defendant would be justified in taking the life of the assailant in defense of another person. It is only the faultless who are exempt from the necessity of retreating while acting in self-defense. Those at fault must retreat, if able to do so; if from the fierceness of the attack or for other reasons they are unable to retreat, they will be excused by the law for not doing so."

31. Before concluding this case, we feel compelled to comment on the failure of the defendant to designate as a formal assignment of error the insufficiency of the evidence at least to first degree murder. While this allegation appears throughout the defendant's brief, it was used only as an introduction and led into other assignments of error. The defendant and her counsel have the discretion, if not the right, to limit the number and scope of issues presented on appeal, and, therefore, we will not interfere with that decision. *See Jones v. Barnes*, 463 U.S. 745, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983); *Whitt v. Holland*, 176 W.Va. 324, 342 S.E.2d 292 (1986). We note, however, that the issue of insufficiency of the evidence is of a constitutional dimension and can be raised for the first time in a state petition for habeas corpus. *See Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State v. Guthrie, supra*.

### III.

### CONCLUSION

For the foregoing reasons, the judgment of the Circuit Court of Wyoming County is affirmed.

Affirmed.