IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

September 2013 Term

**FILED**

**October 7, 2013**

released at 3:00 p.m.
RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

No.  12-1121

STATE OF WEST VIRGINIA,
Plaintiff Below, Respondent

v.

ETHAN CHIC-COLBERT,
Defendant Below, Petitioner

Appeal from the Circuit Court of Kanawha County
Honorable Louis H. Bloom, Judge
Criminal Action Nos. 12-F-320 and 12-M-70

AFFIRMED

Submitted: September 4, 2013
Filed: October 7, 2013

Woody Hill, Esq.                                    Patrick Morrisey, Esq.
Kelli Hill, Esq.                                        Attorney General
Charleston, West Virginia                    Scott E. Johnson, Esq.
Attorneys for Petitioner                       Senior Assistant Attorney General
                                                               Charleston, West Virginia
                                                               Attorneys for Respondent

The opinion of the Court was delivered PER CURIAM.

**SYLLABUS BY THE COURT**

1.  "'Where the issue on an appeal from the circuit court is clearly a question of law or involving an interpretation of a statute, we apply a *de novo* standard of review.' Syllabus point 1, *Chrystal R.M. v. Charlie A.L.*, 194 W.Va. 138, 459 S.E.2d 415 (1995)." Syl. Pt. 1, *State v. Paynter*, 206 W.Va. 521, 526 S.E.2d 43 (1999).

2.  "Generally, the sufficiency of an indictment is reviewed *de novo*. An indictment need only meet minimal constitutional standards, and the sufficiency of an indictment is determined by practical rather than technical considerations." Syl. Pt. 2, *State v. Miller*, 197 W.Va. 588, 476 S.E.2d 535 (1996).

3.  "The function of an appellate court when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, is sufficient to convince a reasonable person of the defendant's guilt beyond a reasonable doubt. Thus, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt." Syl. Pt. 1, *State v. Guthrie*, 194 W.Va. 657, 461 S.E.2d 163 (1995).

4. "A criminal defendant challenging the sufficiency of the evidence to support a conviction takes on a heavy burden. An appellate court must review all the evidence, whether direct or circumstantial, in the light most favorable to the prosecution and must credit all inferences and credibility assessments that the jury might have drawn in favor of the prosecution. The evidence need not be inconsistent with every conclusion save that of guilt so long as the jury can find guilt beyond a reasonable doubt. Credibility determinations are for a jury and not an appellate court. Finally, a jury verdict should be set aside only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt. To the extent that our prior cases are inconsistent, they are expressly overruled." Syl. Pt. 3, *State v. Guthrie*, 194 W.Va. 657, 461 S.E.2d 163 (1995).

5. "'"'An indictment is sufficient under Article III, § 14 of the West Virginia Constitution and W.Va. R.Crim. P. 7(c)(1) if it (1) states the elements of the offense charged; (2) puts a defendant on fair notice of the charge against which he or she must defend; and (3) enables a defendant to assert an acquittal or conviction in order to prevent being placed twice in jeopardy." Syl. Pt. 6, *State v. Wallace*, 205 W.Va. 155, 517 S.E.2d 20 (1999).' Syl. Pt. 5, *State v. Haines*, 221 W.Va. 235, 654 S.E.2d 359 (2007)." Syl. Pt. 4, *Ballard v. Dilworth*, 230 W.Va. 449, 739 S.E.2d 643 (2013).

6. "Rule 12(b)(2) of the West Virginia Rules of Criminal Procedure requires that a defendant must raise any objection to an indictment prior to trial. Although a challenge to a defective indictment is never waived, this Court literally will construe an indictment in favor of validity where a defendant fails timely to challenge its sufficiency. Without objection, the indictment should be upheld unless it is so defective that it does not, by any reasonable construction, charge an offense under West Virginia law or for which the defendant was convicted." Syl. Pt.1, *State v. Miller*, 197 W.Va. 588, 476 S.E.2d 535 (1996).

7. "'An indictment for a statutory offense is sufficient if, in charging the offense, it substantially follows the language of the statute, fully informs the accused of the particular offense with which he is charged and enables the court to determine the statute on which the charge is based.' Syl. Pt. 3, *State v. Hall*, 172 W.Va. 138, 304 S.E.2d 43 (1983)." Syl. Pt. 1, *State v. Mullins*, 181 W.Va. 415, 383 S.E.2d 47 (1989).

Per Curiam:

The petitioner and the defendant below, Ethan Chic-Colbert, appeals the August 16, 2012, order of the Circuit Court of Kanawha County sentencing him to three to fifteen years in the West Virginia Penitentiary for his conviction of one count of child neglect resulting in death and two terms of one to five years for his conviction of two counts of gross child neglect creating a substantial risk of serious bodily injury or of death. All sentences were ordered to be served consecutively, followed by twenty-five years of supervised release.[1] In this appeal, the petitioner contends that alleged errors in the indictment resulted in an illegal sentence being imposed upon him for child neglect resulting in death. The petitioner also asserts that the evidence at trial was insufficient to convict him of child neglect creating a substantial risk of bodily injury. Upon our consideration of the record in this matter, the briefs and arguments of the parties, the applicable legal authority, and for the reasons discussed below, we affirm the petitioner's convictions.

---

[1]The period of supervised release, upon the petitioner's release from the penitentiary or expiration of parole, whichever expires later, was imposed by the trial court pursuant to West Virginia Code § 62-12-26 (2010).

## I. Factual and Procedural Background

The petitioner's convictions arise out of events that occurred around midnight

on the evening of March 4, 2012. At that time, the petitioner, his two-year-old son,[2] Ethan

C. ("Little Ethan"), Little Ethan's mother, Lynitrah Woodson, along with Ms. Woodson's

eleven-year-old son from another relationship, Jahlil C., and two of Jahlil's friends, Tyrel C.

and Andrew P., ages twelve and eleven, respectively, were all traveling in a car being driven

by Ms. Woodson.[3] The petitioner was in the front passenger seat and all four minor children

were in the backseat. The group was returning from an evening spent at a local amusement

center.

Ms. Woodson, Andrew P., and Tyrel C. each testified at trial that as the group

was traveling on Interstate 77 South in Charleston, West Virginia, the petitioner began

striking Ms. Woodson multiple times with his fists.[4] Andrew P. testified that the petitioner

suddenly "took his fist and hit her right in the jaw" as she was driving; that he "just kept

---

[2]The record reflects that the petitioner's son actually turned two years of age one week after the events in question.

[3]We identify the last names of the minor victims in this case by their initials only, following our practice of protecting the identity of juveniles in sensitive cases. *See, e.g., State ex rel. West Virginia Dept. of Human Services v. Cheryl M.*, 177 W.Va. 688, 689 n. 1, 356 S.E.2d 181, 182 n. 1 (1987); *see also* Rule 40(e)(1) of the *West Virginia Rules of Appellate Procedure*.

[4]It appears from the record that the petitioner had become jealous and angry when Ms. Woodson spoke with other people at the amusement center earlier in the evening.

2

hitting her and kept hitting her, and then she told him, 'Please don't do it in front of the kids.' And he just didn't quit." Both Andrew P. and Tyler C. testified that Ms. Woodson had tried to pull over to stop and put the car in park, but the car rolled backwards; the rear of the car struck the Interstate median wall and essentially blocked a lane of travel. Both Andrew and Tyler testified that Jahlil hit the petitioner in an effort to protect his mother, and that they tried to help Jahlil in that effort, but to no effect. Both described how the petitioner then dragged Ms. Woodson from the vehicle by her hair, through the passenger side front door and onto the roadway where he continued to punch, kick, and "stomp" her.[5] The boys further testified that Jahlil ran into the lanes of travel on the Interstate where he tried to flag somebody down to get help. Tyrel testified that there was a lot of traffic; that the roadway was dark; and that he was afraid that Jahlil was going to get struck by a passing motorist.

Meanwhile, two interstate travelers who came upon the scene that night, Mary Crist and Marcie Ball, testified that they saw a car drifting backwards across the lanes of travel on the Interstate until it struck the median wall. They pulled over because they believed the car had been in an accident. Upon exiting their vehicle, they saw the petitioner

---

[5]Specifically, Tyrel testified that the petitioner "opened the door and drug . . . Lynitrah [Ms. Woodson] out by her hair, and me and Jahlil and Andrew started hitting Ethan [the petitioner] to get off of her. And then Jahlil got out. And then I got out, and I saw Ethan [the petitioner] kick Lynitrah in the face and punch her. Then me and Andrew got - - I got out to holler at Jahlil to come back for his baby brother."

3

straddling Ms. Woodson and beating her with his fists.[6] They heard Ms. Woodson screaming at the petitioner to "stop." Other than the petitioner's testimony, there was no evidence that Ms. Woodson had a weapon or that she struck the petitioner at any time during the course of the events herein described.

As Ms. Crist and Ms. Ball were returning to their vehicle to call for help, they saw Jahlil waving for help in the Interstate roadway and then get struck by a passing motorist.[7] Ms. Crist testified that as she was screaming that the boy had been hit, the petitioner got off of Ms. Woodson, kicked her one last time, looked "towards the little boy [Jahlil]," and then "took off running" directly past her and Ms. Ball, over top the guardrail, down a ravine, and up a fence. Ms. Ball testified that she ran to the little boy and "held his little hand" and "got him to look at me, and then he opened his eyes" and then he "closed his little eyes." Jahlil later died of his injuries at a local hospital. Ms. Crist further testified that Andrew and Tyrel soon came running up to them, yelling for help and crying. She stated that as she was calling 911, she was trying to keep the other boys out of the lanes of travel on the Interstate while also trying to keep traffic from striking Ms. Ball. The women tried to hold and comfort Ms. Woodson, as well.

---

[6]As Ms. Crist described it, the woman "was getting [her] butt kicked pretty good[.]"

[7]The motorist who struck Jahlil testified that he did not see Jahlil before he struck him and that no charges were brought against him.

4

On May 18, 2012, the grand jury returned a seven-count indictment against the petitioner charging him with the kidnapping of Ms. Woodson (Count One); domestic battery of Ms. Woodson (Count Two); and felony murder for the death of Jahlil arising out of the kidnapping of Ms. Woodson (Count Three). In Count Four of the indictment, the petitioner was charged with child neglect causing Jahlil's death, as follows:

> And the Grand Jurors aforesaid, upon their oaths aforesaid, do further present that ETHAN SAMUEL CHIC-COLBERT, being the parent, guardian and custodian of Jahlil [C.], a child, on the __ day of March, 2012, and prior to the date of the finding of this Indictment, in the said County of Kanawha, did unlawfully and feloniously neglect Jahlil [C.], and by such neglect, caused the death of the said Jahlil [C.], in violation of Chapter 61, Article 8D, Section 4(a), West Virginia Code 1931, as amended, against the peace and dignity of the State.[8]

(Footnote added.).

---

[8]West Virginia Code § 61-8D-4 (2010) is titled, "Child neglect resulting in injury; child neglect creating risk of injury; criminal penalties." Subsection (a) of this statute provides, as follows:

> (a) If any parent, guardian or custodian shall neglect a child and by such neglect cause said child bodily injury, as such term is defined in section one, article eight-b of this chapter, then such parent, guardian or custodian shall be guilty of a felony and, upon conviction thereof, shall be fined not less than one hundred nor more than one thousand dollars or committed to the custody of the Division of Corrections for not less than one nor more than three years, or in the discretion of the court, be confined in the county jail for not more than one year, or both such fine and confinement or imprisonment.

W.Va. Code § 61-8D-4(a).

The petitioner was also charged with three counts of gross child neglect creating a substantial risk of serious bodily injury or death—one count each for Andrew P., and Tyrel C., and Little Ethan (Counts Five, Six and Seven, respectively)—as follows:

> And the Grand Jurors aforesaid, upon their oaths aforesaid, do further present that ETHAN SAMUEL CHIC-COLBERT, on the __ day of March, 2012, and prior to the date of the finding of this Indictment, in the said County of Kanawha, did unlawfully, feloniously and grossly neglect [Andrew [P.], Tyrel [C.] and Little Ethan], a child, and by such neglect, created a substantial risk of serious bodily injury and death to the said [Andrew [P.], Tyrel [C.], and Little Ethan], in violation of Chapter 61, Article 8D, Section 4(e), West Virginia Code 1931, as amended, against the peace and dignity of the State.[9]

(Footnote added.).

The petitioner's jury trial began on July 9, 2012. In addition to the trial testimony of witnesses, as described above, Ms. Woodson testified that she and the petitioner had lived together periodically during the preceding three years. In fact, the petitioner confirmed that one such period lasted at least a year and a half, and that during the times that

---

[9]Subsection (e) of West Virginia Code § 61-8D-4 (2010) provides, as follows:

> (e) Any person who grossly neglects a child and by the gross neglect creates a substantial risk of serious bodily injury or of death to the child is guilty of a felony and, upon conviction thereof, shall be fined not more than three thousand dollars and confined to the custody of the Division of Corrections for not less than one nor more than five years.

the petitioner lived with Ms. Woodson, he helped to care for not only his child by Ms. Woodson ( Little Ethan), but also for Jahlil, whom he "loved."[10] Ms. Woodson testified that the petitioner had been staying in her home for two or three days prior to the incident in question as they were starting to get back together for the sake of Little Ethan and so Jahlil would have a "father figure." The petitioner's presence in the Woodson home was corroborated by Tyler C., who testified that he went home with Jahlil after school on Friday, March 3, 2012 (the day before Jahlil was killed), to spend the night and that the petitioner, Ms. Woodson, and Little Ethan were all in the home. Regarding their time at the amusement center, Ms. Woodson testified that the petitioner helped to keep an eye on all of the children and that he was with the boys "back when they were at the skating rink."[11]

Following the State's case-in-chief, the petitioner moved for an acquittal on all counts of his indictment, including "neglect causing death." The trial court dismissed the kidnapping count on the basis that the State had failed in its burden of proof. Inasmuch as the felony murder charge was based on the kidnapping charge, the felony murder count was also dismissed by the trial court. Thereafter, the petitioner took the witness stand in his defense at trial.

---

[10]During the sentencing hearing, discussed *infra*, when speaking about Jahlil, the petitioner stated, "I love him with all my heart[,]" and "I was trying to be a good father for him (Jahlil) and my son (Little Ethan) . . . ."

[11]There were apparently multiple activities at the amusement center, including go-carts and a roller skating rink.

The petitioner testified that he did not go to Ms. Woodson's home until the morning of March 4, 2012, and that Ms. Woodson and Tyrel lied when they testified that he was in the Woodson home the prior night. The petitioner admitted, however, that he gave Ms. Woodson's telephone number to the police as his telephone number during their investigation of the events in question; that he had clothes at Ms. Woodson's house because he "stayed there from time to time;" and that he was frequently entrusted with the care of both Jahlil and Little Ethan. He further admitted to talking to and playing with all of the boys—Little Ethan, Jahlil, Tyrel and Andrew—all day on March 4th.

Regarding his altercation with Ms. Woodson, the petitioner claimed that Tyrel, Andrew, Ms. Crist, Ms. Ball, and Ms. Woodson all lied during their trial testimony about the events that transpired up to, including, and after Jahlil was struck by the vehicle on the Interstate. He testified that Ms. Woodson was the aggressor; that she was hitting him; that she grabbed him as he tried to leave the car; that she started wrestling with him after he exited the car; that he "slam[med]" her to the ground to get away from her; and that she chased him to the Interstate guardrail, which he jumped in an effort to flee from her. The petitioner further testified that it was Ms. Woodson who abandoned the children on the Interstate that night—not him:

> Q. You blame Lynitrah [Ms. Woodson]?
> A. Yes, sir.
> • • • •

Q. Isn't it true that you took "Jah" [Jahlil] by your own actions toward Lynitrah that night? That your beating of her is what led to his death?

A. No, sir.

• • • •

Q. You're not going to take responsibility for it; are you?

A. No, sir. I don't have any responsibility. I didn't do anything wrong, sir.

• • • •

Q. I want to ask you a question, Ethan, about the boys up on the interstate.

A. Yes, sir.

Q. When you took off up there, they didn't have anybody to care for them; did they?

A. Except for Lynitrah Woodson, sir.

Q. And when you took off up there, they were at risk of being hit by another car, a semi, anything that might come through there; is that right?

A. When I took off, sir, I didn't see no kids get out of the car, sir. So I guess it was up to Lynitrah Woodson that was chasing me, sir.

Q. You feel that you have no responsibility for the care of Jahlil or the other two boys?

A. Never saw any kids get out of the car, sir, so no, sir.[12]

When asked about leaving his two-year-old son, Little Ethan, in the car on the Interstate, the petitioner responded, "Lynitrah Woodson left him on the interstate, sir."

Both sides rested and the trial court proceeded to jury instructions. When the trial court asked both the State and the defense if they were satisfied with the instructions and

---

[12]At his sentencing hearing, discussed *infra*, the petitioner continued to assert that he was not to blame for Jahlil's death.

the jury verdict form,[13] both responded in the affirmative. Accordingly, as to Count Four, the jury was instructed, *without objection*, as follows:

> [b]efore the defendant, Ethan Chic-Colbert, can be convicted of child neglect by a parent, guardian, custodian resulting in death of a child, the State of West Virginia must overcome the presumption that the defendant, Ethan Chic-Colbert, is innocent and prove to the satisfaction of the jury beyond a reasonable doubt 1) the defendant, Ethan Chic-Colbert 2) in Kanawha County, West Virginia 3) on or about the 4th day of March, 2012 4) then being a parent, guardian or custodian of Jahlil [C.], a child 5) did unlawfully and knowingly neglect Jahlil [C.], a child under his care, custody and control and 6) and by such neglect caused the death of said Jahlil [C.].

After the jury was instructed and was about to begin its deliberations, the petitioner's counsel advised the trial court that there was a problem with the indictment. The petitioner's counsel essentially argued that although the State intended to charge the petitioner in Count Four with child neglect resulting in *death*, the indictment erroneously referenced West Virginia Code § 61-8D-4(a), which is child neglect causing bodily injury,

---

[13]The verdict form as to Count Four read:

_____We, the Jury, find the defendant **guilty** of the offense of Child Neglect Resulting in Death as contained in Count Four of Indictment Number 12-F-320.
_____ We, the Jury, find the defendant **not guilty**.

10

rather than the intended statute, West Virginia Code § 61-8D-4a(a),[14] which is child neglect resulting in death. The trial court responded, in part, as follows:

> I'm not going to address the merits at this point as to whether or not something needs to be done, because I don't believe we can cure that at this time . . . So *I think we'll have to address that in post-trial motions rather than at this point*.

Thereafter, the jury returned its verdict finding the petitioner guilty of domestic battery of Ms. Woodson, child neglect causing Jahlil's death, and three counts of gross child neglect relating to Little Ethan, Andrew and Tyrel. On August 15, 2012, the sentencing hearing was held during which the trial court addressed the petitioner's post-trial motion for acquittal. The petitioner argued, *inter alia,* that there was insufficient evidence that he was either the parent, guardian or custodian of either Tyrel, Andrew, or Jahlil on the night in question and that it was Ms. Woodson's actions that caused Jahlil's death. Significantly, the petitioner did *not* raise any issue regarding Count Four, although the trial court had essentially invited him to do so, as indicated above. The State responded and highlighted the fact that the only support for the petitioner's version of events was the petitioner's testimony and that the jury clearly chose to believe the State's witnesses, not only as to the petitioner's

---

[14]West Virginia Code § 61-8D-4a(a) provides, in part, that "[i]f any parent, guardian or custodian shall neglect a child under his or her care, custody or control and by such neglect cause the death of said child, then such parent, guardian or custodian shall be guilty of a felony . . . ."

11

battery of Ms. Woodson, but the fact that he voluntarily assumed a supervisory role of the minor children for purposes of their outing on March 4, 2012.

Thereafter, the trial court denied the petitioner's post-verdict motion for acquittal and sentenced him by the final order entered August 16, 2012. This appeal followed.

## II. Standard of Review

The petitioner presents two assignments of error for our review. First, he contends that Count Four of the indictment was insufficient and as a result, the trial court imposed an illegal sentence.[15] In syllabus point one of *State v. Paynter*, 206 W.Va. 521, 526 S.E.2d 43 (1999), this Court held that "'[w]here the issue on an appeal from the circuit court is clearly a question of law or involving an interpretation of a statute, we apply a *de novo* standard of review.' Syllabus point 1, *Chrystal R.M. v. Charlie A.L.*, 194 W.Va. 138, 459 S.E.2d 415 (1995)." We have also expressly stated that we apply a de novo standard of review with regard to the sufficiency of indictments: "Generally, the sufficiency of an indictment is reviewed *de novo*. An indictment need only meet minimal constitutional

---

[15]As indicated above, the trial court imposed a sentence of three to fifteen years for petitioner's conviction of child neglect result in death. West Virginia Code § 61-8D-4(a), child neglect resulting in bodily injury, carries a penalty of one to three years in the penitentiary or, in the discretion of the court, confinement in the county jail for one year.

standards, and the sufficiency of an indictment is determined by *practical* rather than *technical* considerations." Syl. Pt. 2, *State v. Miller*, 197 W.Va. 588, 476 S.E.2d 535 (1996) (emphasis added).

The petitioner's second assignment of error challenges the sufficiency of the evidence for his conviction of two counts of gross child neglect creating a substantial risk of serious bodily injury or of death.[16] In syllabus point one of *State v. Guthrie*, 194 W.Va. 657, 461 S.E.2d 163 (1995), we explained that

> [t]he function of an appellate court when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, is sufficient to convince a reasonable person of the defendant's guilt beyond a reasonable doubt. Thus, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt.

For purposes of conducting this inquiry, our decision in *Guthrie* provides us with further guidance:

> A criminal defendant challenging the sufficiency of the evidence to support a conviction takes on a heavy burden. An appellate court must review all the evidence, whether direct or circumstantial, in the light most favorable to the prosecution and must credit all inferences and credibility assessments that the

---

[16]The petitioner challenges his convictions relating to Andrew P. and Tyrel C; he does not challenge his conviction of gross child neglect creating a substantial risk of serious bodily injury or death of his son, Little Ethan, as charged in Count Seven of the indictment.

13

jury might have drawn in favor of the prosecution. The evidence need not be inconsistent with every conclusion save that of guilt so long as the jury can find guilt beyond a reasonable doubt. Credibility determinations are for a jury and not an appellate court. Finally, a jury verdict should be set aside only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt. To the extent that our prior cases are inconsistent, they are expressly overruled.

Syl. Pt. 3, *Guthrie*, 194 W.Va. at 663, 461 S.E.2d at 169.

With these standards in mind, the parties' arguments will be considered.

## III. Discussion

### A. Count Four of the Indictment

The petitioner first contends that he was illegally sentenced because Court Four of the indictment charged him with violating West Virginia Code § 61-8D-4(a) (child neglect causing injury), yet he was convicted and sentenced pursuant to West Virginia Code § 61-8D-4a(a) (child neglect resulting in death). The essence of the petitioner's claim is that the typographical error in the statutory citation in Count Four and the absence of the specific language "under his or her care, custody or control," as contained in West Virginia Code § 61-8D-4a(a), resulted in him being charged with child neglect causing *bodily injury*, despite the fact that the count specifically alleged child neglect *causing death*.

14

In *Ballard v. Dilworth*, 230 W.Va. 449, 739 S.E.2d 643 (2013), we explained that our prior case law instructs us that

> "'[a]n indictment is sufficient under Article III, § 14 of the West Virginia Constitution[17] and W.Va.R.Crim.P. 7(c)(1) if it (1) states the elements of the offense charged; (2) puts a defendant on fair notice of the charge against which he or she must defend; and (3) enables a defendant to assert an acquittal or conviction in order to prevent being placed twice in jeopardy.' Syl. Pt. 6, *State v. Wallace*, 205 W.Va. 155, 517 S.E.2d 20 (1999)." Syl. Pt. 5, *State v. Haines*, 221 W.Va. 235, 654 S.E.2d 359 (2007).

230 W.Va. 449, 739 S.E.2d 643, syl. pt. 4 (footnote added). Thus, we must evaluate Count Four in terms of whether it provided the petitioner with enough information to defend against the charge of child neglect resulting in death and whether it will bar a future prosecution for the same offense.

We begin our analysis by observing that the petitioner's challenge to Count Four was untimely. Rule 12(b)(2) of the West Virginia Rules of Criminal Procedure provides that "[d]efenses and objections based on defects in the indictment or information (other than that it fails to show jurisdiction in the court or to charge an offense which objections shall be noticed by the court at any time during the pendency of the proceedings) *must be raised prior to trial*." (Emphasis added). In addition, this Court has held:

_____

[17]Article III, Section 14 of the West Virginia Constitution provides, in pertinent part, that "the accused shall be fully and plainly informed of the character and cause of the accusation."

15

> Rule 12(b)(2) of the West Virginia Rules of Criminal Procedure
> requires that a defendant must raise any objection to an
> indictment prior to trial. Although a challenge to a defective
> indictment is never waived, this Court literally will construe an
> indictment in favor of validity where a defendant fails timely to
> challenge its sufficiency. Without objection, the indictment
> should be upheld unless it is so defective that it does not, by any
> reasonable construction, charge an offense under West Virginia
> law or for which the defendant was convicted.

Syl. Pt. 1, *Miller*, 197 W.Va. at 592-93, 476 S.E.2d at 539-40. We explained the reason for this rule in *State v. Palmer*, 210 W.Va. 372, 376, 557 S.E.2d 779, 783 (2001):

> The purpose behind this rule is to prevent a criminal defendant
> from 'sandbagging' or deliberately foregoing raising an
> objection to an indictment so that the issue may later be used as
> a means of obtaining a new trial following conviction. *See* 4
> Wayne R. LaFave et al., *Criminal Procedure* § 19.1(d), at 741
> (2d ed.1999). The rule we announced in *Miller* now makes this
> stratagem extremely perilous.

Here, the petitioner did not challenge the indictment until *after* the jury was instructed and was about to begin its deliberations. Accordingly, we will construe Count Four in favor of validity given the petitioner's failure to timely raise his challenge below.[18]

The petitioner's first challenge to Count Four is premised on a typographical error that, based upon the record before us, did not prejudice him at trial. The statutory

---

[18]The petitioner also contends that because he is challenging his sentencing, the relaxed standard of review to be applied when a challenge to an indictment is untimely raised, per *Miller*, does not apply. As discussed more fully below, the petitioner's challenge to his sentencing is meritless based on our decision herein.

reference for child neglect resulting in death is West Virginia Code § 61-8D-**4a(a)**. (Emphasis added.). However, the statutory reference in Count Four of the indictment was missing the lower case letter "a." More specifically, Count Four referenced "Chapter 61, Article 8D, Section **4(a)**," which is the statutory reference for child neglect resulting in bodily injury. (Emphasis added.).

This Court has previously declared that typographical errors are not fatal to an indictment. Syl. Pt. 1, in part, *State v. Rudy*, 98 W.Va. 444, 127 S.E.2d 190 (1925) ("'typographical errors are not fatal to an indictment, where they do not affect the sense, and the meaning of such words can be determined with certainty by a person of ordinary intelligence."); *see also State v. McCartney*, 228 W.Va. 315, 719 S.E.2d 785 (2011) (error in spelling of victim's name typographical error that did not affect substance of allegations in indictment); *People v. Dean*, 709 N.E.2d 284 (Ill. 1999) (indictment properly charged armed violence based on section 5/12-4(a) although indictment referred to "Section 5/12-4A"); *State v. Carter*, 981 So.2d 734 (La. 2008) (no prejudice where typographical error in statutory citation in indictment read "40:968A1G" when correct citation for offense was "40:968(A)(1);" nothing in record to show that defendant was misled); *Payton v. State*, 41 So.3d 713 (Miss. 2010), *cert. denied*, _ U.S. _, 131 S.Ct. 1482 (2011) (indictment sufficient where substance of indictment charged defendant with proper crime although typographical error in subsection number of charging statute); *Wright v. State*, 958 So.2d 158 (Miss. 2007)

17

(indictment sufficient to provide notice to defendant notwithstanding typographical error in subsection number of statute cited); *State v. McKisson*, No. COA02-955, 2003 WL 21649214, 159 N.C.App. 229 (2003) (typographical error in statutory number referenced non-fatal to indictment even where short-form indictment used to charge offense); *State v. Johnson*, 2002 WL 130537 (Del. Super. Jan. 31, 2002)(correction to typographical error in indictment from § 1447 to § 1447A did not charge new offense and substantial rights of defendant not implicated).

In the case at bar, notwithstanding the omission of a letter "a," there can be no doubt that the State charged the petitioner with child neglect resulting in death when Count Four expressly stated that the petitioner did "unlawfully and feloniously neglect Jahlil [C.], and by such neglect, *caused the death* of the said Jahlil [C.][.]"[19] Such language is a clear reference to West Virginia Code § 61-8D-4a(a). Moreover, under the facts of this case, it would have been nonsensical for the State to charge the petitioner with child neglect causing bodily injury when his victim, in fact, died.[20]

---

[19]West Virginia Code § 61-8D-1(6) (2010) defines "neglect" for purposes of the charged offense as follows:

> "Neglect" means the unreasonable failure by a parent, guardian,
> or any person voluntarily accepting a supervisory role towards
> a minor child to exercise a minimum degree of care to assure
> said minor child's physical safety or health.

[20]Although the petitioner argues that Jahlil's death satisfies the bodily injury
(continued...)

18

The petitioner's second challenge to the indictment is premised on his contention that Count Four failed to assert all elements of the offense, specifically that Jahlil was "under the care, custody or control"[21] of the petitioner when the events herein transpired.[22] In syllabus point one of *State v. Mullins*, 181 W.Va. 415, 383 S.E.2d 47 (1989),

[20](...continued) requirement for West Virginia Code § 61-8D-4(a) (child neglect causing bodily injury), and he should therefore be sentenced under that statute, we are unpersuaded. The Legislature created two offenses: child neglect resulting in death (§ 61-8D-**4a(a)**) and child neglect resulting in bodily injury (§ 61-8D-**4(a)**). In short, if the Legislature intended *bodily injury* to include *death*, there would be no need for § 61-8D-4a(a).

[21]As previously indicated, § 61-8D-4a(a) provides, relevant part, that "[i]f any parent, guardian or custodian shall neglect a child under his or her care, custody or control and by such neglect cause the death of said child, then such parent, guardian or custodian shall be guilty of a felony . . . ."

[22]The petitioner cites *State v. Longerbeam*, 226 W.Va. 535, 703 S.E.2d 307 (2010), for the proposition that one's status as a "custodian" is distinct from "care, custody or control," and, therefore, he contends that Count Four fails to charge him with child neglect resulting in death because the words "care, custody or control" are not included in Count Four. In *Longerbeam*, the defendant was convicted of violating West Virginia Code § 61-8D-5(a), which addresses sexual abuse of children. Similar to § 61-8D-4a(a), the words "parent, guardian or custodian[,]" as well as "care, custody or control[,]" are contained in § 61-8D-5(a). We stated in *Longerbeam* that the State had to prove both that the defendant fell within one of the statutorily specified classes of delineated individuals and that the sexual abuse occurred when the child was under the defendant's care, custody or control. 226 W.Va. at 541, 703 S.E.2d at 313.

Based upon our review of the record in the case *sub judice*, the State clearly proved both the petitioner's status as a custodian of Jahlil and that his "neglect," which resulted in Jahlil's death, occurred while Jahlil was under his care, custody or control. As indicated previously, "neglect" is defined as "the unreasonable failure by a parent, guardian, or any person voluntarily accepting a *supervisory* role towards a minor child . . . ." W.Va. Code §61-8D-1(6) (emphasis added). In *Longerbeam*, we explained that "supervision" means "care, custody or control" and we equated "supervision" with the "statutorily-specific 'care,

(continued...)

19

we stated, as follows:

> "An indictment for a statutory offense is sufficient if, in charging the offense, it *substantially* follows the language of the statute, fully informs the accused of the particular offense with which he is charged and enables the court to determine the statute on which the charge is based." Syl. Pt. 3, *State v. Hall*, 172 W.Va. 138, 304 S.E.2d 43 (1983).

(Emphasis added). In the case *sub judice*, it is clear that Count Four of the indictment *substantially* follows the language of West Virginia Code § 61-8D-4a(a).[23] Furthermore, it includes words charging the petitioner with being a "parent, guardian and custodian" of Jahlil. Because the petitioner was neither the parent nor guardian[24] of Jahlil, the relevant word was "custodian." Such term connotes not only care or control in terms of its common

---

[22](...continued)
custody or control[.]'" *Longerbeam*, 226 W.Va. at 541, 703 S.E.2d at 313. Moreover, unlike the facts in *Longerbeam*, where the defendant had been with the victim for only a very short period of time when the sexual abuse occurred, here, the petitioner had been with Jahlil, Little Ethan and Tyrel for more than a day, and with Andrew for seven or eight hours, before the group went to the amusement center.

[23]*See supra* n.14.

[24]A "guardian" is "a person who has care and custody of a child as the result of any contract, agreement or legal proceeding." W.Va. Code § 61-8D-1(5) (2010).

20

meaning[25] but West Virginia Code § 61-8D-1(4) [1988] defines "custodian" for purposes

of the offense charged as:

> [a] person over the age of fourteen years *who* has or *shares* actual physical possession or *care and custody of a child on* a full-time or *temporary basis*, regardless of whether such person has been granted custody of the child by any contract, agreement or legal proceeding. *"Custodian" shall also include*, but not be limited to, the spouse of a parent, guardian or custodian, or *a person cohabiting with a parent*, guardian or custodian in the relationship of husband and wife, where such spouse or other person shares actual physical possession or care and custody of a child with the parent, guardian or custodian.

(Emphasis added.). Importantly, this statutory definition was given as a part of the circuit

court's jury instructions on Count Four and was later recited by the petitioner's own counsel

during closing arguments. Also, during closing arguments, the petitioner's counsel argued

that before the petitioner could be convicted of "child neglect by parent, guardian, custodian

resulting in death of a child[,] the State . . . [has] to prove . . . that . . . [the petitioner] . . .was

a parent, guardian or custodian of Jahlil [C.]." The petitioner's counsel further argued that

the petitioner did not "share actual physical possession or care or custody of Jahlil . . . ."

These very words reflect that the petitioner and his counsel understood that part of the State's

---

[25]*See State v. Stephens*, 206 W.Va. 420, 422, 525 S.E.2d 301, 303 (1999) (wherein we acknowledged "the ordinary dictionary meanings of the words 'custody' (immediate charge and control) and 'temporary' (lasting for a limited time) ( *Merriam Webster's New Collegiate Dictionary* (1979) . . . ."). *See also State v. Collins*, 221 W.Va. 229, 233-34, 654 S.E.2d 115, 119-20 (2007) (word "custody" defined as care and control of a thing or person and absent statutory definition of the term we defer to "common, ordinary, and accepted meanings of the terms in the connection in which they are used.").

burden was to prove that the petitioner had care, custody or control of Jahlil before he could

be convicted of child neglect causing Jahlil's death.

Under our statute of jeofails,[26] West Virginia Code § 62-2-11 (2010), a

"[j]udgment in any criminal case, after a verdict, shall not be arrested or reversed upon any

exception to the indictment or other accusation, if the offense be charged therein with

sufficient certainty for judgment to be given thereon, according to the very right of the case."

*See State v. Casdorph*, 159 W.Va. 909, 912, 230 S.E.2d 476, 479 (1976), *abrogated on other*

*grounds by State v. Persinger*, 169 W.Va. 121, 286 S.E.2d 261 (1982) ("Our statute of

jeofails, *W.Va.Code*, 62-2-11 [1923] [footnote omitted] cures any technical defect in an

indictment when the indictment sufficiently apprises the accused of the charge which he must

face."   Moreover, in *State v. Wallace*, 205 W.Va. 155, 517 S.E.2d 20 (1999), this Court

explained that

> [t]he sufficiency of a criminal indictment is measured in
> practical, commonsense terms by whether it meets these basic
> constitutional requirements. "No particular form of words is
> required . . . so long as the accused is adequately informed of the
> nature of the charge and the elements of the offense are
> alleged."

*Id.* at 161, 517 SE.2d at 26 (internal citations omitted).   In *Wallace*, the defendant was

charged with burglary.  We found that if burglary requires that an entry be unauthorized, such

---

[26]"Jeofail" is defined as "a pleading error or oversight . . . ."  Black's Law Dictionary 912 (9th ed. 2009).

22

"requirement is subsumed by the breaking element itself[,]" thus the absence of the word "burglariously" was not fatal to the indictment. *Id.* at 161-62, 517 S.E.2d at 26-27 (emphasis added).[27]  *See also State v. Nestor*, 175 W.Va. 539, 541, 336 S.E.2d 187, 189 (1985) (an indictment can plainly inform the defendant of nature of crime charged "without being a mirror image of the statute");  *State v. Neary*, 179 W.Va. 115, 121, 365 S.E.2d 395, 401 (1987) (failure to use words "pecuniary interest" insufficient to invalidate indictment where defendant fully informed of offense charged)*; State v. George W.H.*, 190 W.Va. 558, 439 S.E.2d 423 (1993) (indictment sufficient to charge second degree sexual assault although "sexual contact" used instead of "sexual intercourse" or "sexual intrusion" when count in all other ways identified charge as second degree sexual assault and defendant fully aware of the charge).

In the case *sub judice*, upon construing the indictment in favor of validity and measuring it by practical and common sense terms, rather than technical considerations, we find that *subsumed* into the word "custodian" in Count Four is "care, custody or control" such that the petitioner was adequately apprised that he was charged with having Jahlil C.

_____

[27]In *Wallace*, we also stated that "[i]ndictments are now considered 'from the broad and enlightened standpoint of common sense and right reason rather than from the narrow standpoint of petty preciosity, pettifogging, technicality or hair splitting fault finding.' *Parsons v. United States*, 189 F.2d 252, 253 (5th Cir.1951)." *Wallace*, 205 W.Va. at 159-60, 517 S.E.2d at 24-25.

under "his care, custody or control" and that his neglect of Jahlil resulted in his death.[28]

Moreover, the petitioner's custodial role regarding Jahlil was fully supported by trial testimony demonstrating that he periodically cohabitated[29] with Ms. Woodson, Jahlil and Little Ethan, most recently in the days leading up to the events in question;[30] that he kept clothing at the Woodson residence; that he gave Ms. Woodson's telephone number to investigating officers as his own; and that he admittedly helped to care for both Jahlil and Little Ethan. As indicated previously, during the sentencing hearing, the petitioner stated, "I love him [Jahlil] with all my heart[,]" and "I was trying to be a good father for him [Jahlil] and my son [Little Ethan] . . . ."

In *State v. Neal*, 179 W.Va. 705, 371 S.E.2d 633 (1988)*,* we addressed the sufficiency of an indictment for attempted murder and stated, as follows:

---

[28]The petitioner cites *State v. Corra*, 223 W.Va. 573, 678 S.E.2d 306 (2009), for his argument that he was convicted of an offense different than the one charged in Count Four. We find *Corra* to be distinguishable as it involved a variance between the charge in the indictment and the proof at trial. Specifically, the defendant in *Corra* was charged with "furnishing alcoholic liquor" to underage persons, but was convicted of "furnishing nonintoxicating beer." Here, there was no such variance. Count Four charged the petitioner with child neglect causing death, which was the proof offered by the State at trial, and which was the offense for which the petitioner was convicted.

[29]This cohabitation also served as proof that the petitioner was Jahlil's "custodian" per the statutory definition of that term, as set forth *supra*.

[30]During opening statements, the petitioner's counsel recounted a conversation that the petitioner had with Ms. Woodson in the car on the night in question and stated that the petitioner told Ms. Woodson, "'I want to come home with you. All [of] my clothes are at your house, we have been living there together, we're getting along all right . . . .'"

24

the record reveals that at all pre-trial hearings, and during trial, the accused was fully aware that count 3 was an indictment for attempted murder. No bill of particulars was requested pursuant to W.Va.R.Crim.P. 12(b)(2) (1981), and all arguments by defense counsel refer to count 3 as attempted murder. "[T]here can be no doubt that the accused was fully informed of the particular offense charged." *State v. Neary*, 179 W.Va. 115, 121, 365 S.E.2d 395, 401 (1987).

*Neal,* 179 W.Va. at 711, 371 S.E.2d at 639. Similarly, in this case, there can be no doubt that the petitioner was fully informed of the particular offense charged. During the petitioner's arraignment, the trial court asked the petitioner whether he was sufficiently aware of the charge of *child neglect resulting in death* so as to enter a plea of guilty or not guilty. The petitioner entered a plea of not guilty.[31] During the pre-trial hearing, the trial court asked the State for a proffer of evidence. In the presence of the petitioner, the prosecutor responded, "he's charged with several different offenses. There's *child neglect resulting in death*[.]" During opening statements at trial, the prosecutor stated, "The grand jury returned

---

[31]Specifically, during the arraignment, the following exchange occurred:

> THE COURT: And you have received and had an opportunity to discuss with your counsel the seven count indictment in this case; is that correct?
> MR. CHIC-COLBERT: Yes, sir.
> THE COURT: And you are charged with various offenses of kidnapping, domestic battery, murder, *child neglect resulting in death* and child neglect creating a substantial risk of serious bodily injury and death. Do you understand those charges sufficiently to enter a plea of guilty or not guilty?
> MR. CHIC-COLBERT: Not guilty, sir.

(Emphasis added.).

an indictment charging *child neglect resulting in death . . . .*" (Emphasis added.). During the petitioner's mid-trial motion for an acquittal, his counsel referenced the charge of *neglect causing death*. During the instructional phase of trial, the jury was instructed, in the presence of the petitioner, on *child neglect resulting in death* for Count Four without objection. During closing arguments, both the prosecutor and the petitioner's counsel referenced the charge of *child neglect resulting in death*. Based on all of the above, we conclude that Count Four was constitutionally sufficient; that the petitioner had fair notice that he was charged with child neglect causing the death of Jahlil C. in violation of West Virginia Code § 61-8D-4a(a); and that he is not at risk of being placed twice in jeopardy. *See Dilworth*, 230 W.Va. 449, 739 S.E.2d 643. Thus, having been convicted of the crime for which he was charged–child neglect resulting in death–we find that the petitioner's challenge to his sentencing on Count Four is without merit.[32]

## B. Sufficiency of the Evidence on Counts Five and Six

The petitioner next asserts that the circuit court erred in denying his motion for a judgment of acquittal as to the felonies charged in Counts Five and Six of the indictment based on insufficiency of the evidence. As noted, these counts charged the petitioner with gross child neglect creating a substantial risk of serious bodily injury and death of Andrew

---

[32]*Cf. Davis v. State*, 29 So.3d 788 (Miss. 2009) (defendant's sentence not illegal due to change in statutory citation following indictment where nature and cause of charge clear).

P. and Tyrel C. in violation West Virginia Code § 61-8D-4(e).[33]  The petitioner contends that based on the statutory definition of "neglect,"[34] the evidence at trial was insufficient to prove that he "voluntarily accepted a supervisory role" regarding either Andrew or Tyrel, both minor children.

In contrast, the State argues that there was sufficient evidence at trial to prove the petitioner's neglect of Andrew and Tyrel; that there need not be an "explicit parental delegation of supervisory responsibility[;]"[35] and that acceptance of supervisory responsibility can come in words, actions, and course of conduct.  We agree.[36]

The evidence at trial demonstrated that through the petitioner's actions and conduct, he accepted supervisory responsibility over all four boys, including Tyrel and Andrew.  Ms. Woodson testified that she and the petitioner had lived together periodically,

---

[33]*See supra* n.9.

[34]*See supra* n.19.

[35]*See Snow v. Commonwealth*, 537 S.E.2d 6, 10 (Va. Ct. App. 2000) ("[O]ne may become a person 'responsible for the care of a child' by a voluntary course of conduct and without explicit parental delegation of supervisory responsibility or court order.").

[36]We are equally unpersuaded by the petitioner's argument that the State's interpretation of § 61-8D-4(e) would mean that a duty would be imposed on any person in the presence or vicinity of a child.  Such argument is an unfounded exaggeration particularly where, as here, the evidence demonstrated that the petitioner was more than just in the "vicinity" or "presence" of Tyrel and Andrew.

most recently, in the days leading up to the events in question. Tyrel testified that he spent Friday night, March 3rd, with Jahlil in the Woodson home and that the petitioner was present. Andrew's testimony revealed that he was at Ms. Woodson's house for seven or eight hours prior to the group going to the amusement center, and that the petitioner was also there. In fact, the petitioner admitted during his trial testimony that he interacted with all of the boys, including Tyrel and Andrew, explaining, "I'm not going to be rude to other kids and not talk and play with other kids and interact with them while they're around." Ms. Woodson testified she and the petitioner decided to take the boys to the amusement center on the evening in question; that while the group was at the amusement center, the petitioner helped to keep an eye on all the boys, including Andrew and Tyrel; and that the petitioner was with the boys "back when they were at the skating rink."

In summary, we find that the evidence at trial sufficiently demonstrated that the petitioner spent, at a minimum, more than a day with Tyrel and at least half a day with Andrew by the time the group went to the amusement center and that he interacted with them during that time. Further, the petitioner had lived in the Woodson home for two or three days prior to the events in question and intended to go to the Woodson home upon their return from the amusement center. The petitioner clearly conducted himself as someone with authority in the Woodson home by supervising Little Ethan and Jahlil and helping Ms. Woodson look after and be responsible for all four boys while at the amusement center.

28

Viewing all of the evidence in the light most favorable to the prosecution and after crediting the jury with making all findings of fact and drawing all reasonable inferences therefrom in favor of the State, and leaving all credibility determinations to the jury, we find that the evidence was clearly sufficient for the jury to find that the petitioner voluntarily assumed a supervisory role with regard to Andrew and Tyrel for purposes of Counts Five and Six; that he grossly neglected them by creating a dangerous situation on an Interstate highway through his attack upon Ms. Woodson; and that the petitioner thereafter fled the scene leaving Andrew and Tyrel on the Interstate highway around midnight.[37]  Accordingly, we further find that the circuit court correctly denied the petitioner's motion for acquittal on Counts Five and Six.

## IV. Conclusion

For the reasons stated above, the petitioner's conviction and sentencing on one count of child neglect resulting in the death of Jahlil C. and conviction and sentencing on two

---

[37]As indicated previously, the petitioner testified that he had no responsibility for the care of the boys on the Interstate on the night in question because he did not see any of them exit the car.  Whether the children exited the vehicle is irrelevant to the petitioner's neglect.  The petitioner created a seriously dangerous situation by his attack upon Ms. Woodson, which resulted in the boys being left alone in a stopped car blocking a lane of travel on the Interstate around midnight.  Thus, even if Jahlil, Andrew and Tyrel had remained in the car, which they did not, they would nonetheless have been at substantial risk of serious bodily injury or death.

29

counts of gross child neglect creating a substantial risk of serious bodily injury or death to Andrew P. and Tyrel C. in the Circuit Court of Kanawha County are hereby affirmed.

Affirmed.